The DELTONA CORPORATION

v.

The UNITED STATES.

No. 370–76.

United States Court of Claims.

Aug. 19, 1981.

William L. Earl, Miami, Fla., atty. of record, for plaintiff.

Fred R. Disheroon, Washington, D. C., with whom was Asst. Atty. Gen. Carol E. Dinkins, Washington, D. C., for defendant. Nancy J. Marvel and Diane L. Donley, Washington, D. C., of counsel.

Before FRIEDMAN, Chief Judge, SKELTON, Senior Judge, and KUNZIG, Judge.

## OPINION

KUNZIG, Judge:

In this case, plaintiff contends that it has suffered an uncompensated taking as the consequence of federal regulation affecting its development of a planned subdivision along the Gulf coast of Florida.[1] The statutes in question—§ 10 of the Rivers and Harbors Appropriation Act of 1899, 33 U.S.C. § 403, and § 404 of the Federal Water Pollution Control Act Amendments of 1972, 33 U.S.C. § 1344—and implementing regulations thereunder, prohibit, *inter alia*, dredging and filling in navigable waters without the authorization of the Department of the Army. The latter, stressing environmental factors, has thus far steadfastly refused to grant plaintiff the permits it needs to finish its project. We hold that while plaintiff may indeed have sustained an economic loss, the loss is not such as to constitute a Fifth Amendment taking under the circumstances herein.

## I. BACKGROUND

A. Applicable Statutes and Regulations: A Pattern of Stiffening Requirements.

1. *Section 10 of the Rivers and Harbors Appropriation Act of 1899*, 30 Stat. 1121, 1151, 33 U.S.C. § 403 (1976) (Rivers and Harbors Act), provides in part:

> That the creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is hereby prohibited . . . .

The section goes on to outlaw various structures in any navigable water of the United States except those initiated by plans recommended by the Chief of Engineers and authorized by the Secretary of the Army. Section 10 then states that

> it shall not be lawful to excavate or fill, or in any manner to alter or modify the . . . capacity of . . . the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of War [now the Army] prior to beginning the same.

*See United States v. Republic Steel Corp.*, 362 U.S. 482, 484–485, 80 S.Ct. 884, 886, 4 L.Ed.2d 903 (1960).[2]

---

1. The court rejects the trial judge's recommended conclusion of law. While the trial judge also made findings of fact, all the findings necessary to the rendering of this decision are contained herein.

2. Section 10 provides in full:

    That the creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not

be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by

The Secretary of the Army has delegated to the Corps of Engineers the authority to issue or deny Section 10 permits. 33 C.F.R. § 322.5 (1980). The Corps, in turn, has adopted the following definition of "navigable waters of the United States" in order to mark out the extent of its regulatory jurisdiction under the Rivers and Harbors Act:

> The term "navigable waters of the United States" means those waters of the United States that are subject to the ebb and flow of the tide shoreward to the mean high water mark ... and/or are presently used, or have been used in the past, or may be susceptible to use to transport interstate or foreign commerce.

33 C.F.R. § 322.2(a) (1980). *See generally* 33 C.F.R. § 329.4 (1980).[3] The Corps notes that the "policies and criteria" reflected in its definition "are in close conformity with the tests used by the Federal Courts." 33 C.F.R. § 329.3 (1980).

The Supreme Court has described Section 10 as a type of "general proscription" or "ban," the intent being "to benefit the public at large by empowering the federal government to exercise its authority over interstate commerce with respect to obstructions" in the navigable waters of the United States. *California v. Sierra Club*, —— U.S. ——, ——, 101 S.Ct. 1775, 1779, 68 L.Ed.2d 101 (1981).

2. *Section 404 of the Federal Water Pollution Control Act Amendments of 1972*, 86 Stat. 816, 884, 33 U.S.C. § 1344 (1976) (FWPCA), generally prohibits the "discharge of dredged or fill material into ...

navigable waters" absent a permit from the Army Corps of Engineers. *See also* FWPCA § 301, 86 Stat. 844, 33 U.S.C. § 1311 (1976).[4] The term "navigable waters" is defined by FWPCA as "the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7) (1976). It is now well settled that Congress, by adopting this 1972 definition, "asserted federal jurisdiction over the nation's waters to the maximum extent permissible under the Commerce Clause of the Constitution," *Natural Resources Defense Council, Inc. v. Callaway*, 392 F.Supp. 685, 686 (D.D.C.1975); *accord, e. g., Conservation Council v. Costanzo*, 398 F.Supp. 653, 674 (E.D.N.C.), *affirmed*, 528 F.2d 250 (1975), and intended a departure from the traditional tests used to delimit Corps jurisdiction under the Rivers and Harbors Act, *viz*, tidal waters extending to the mean high water mark and/or waters susceptible to use to transport interstate or foreign commerce. *See, e. g., Wyoming v. Hoffman*, 437 F.Supp. 114 (D.Wyo. 1977); *United States v. Holland*, 373 F.Supp. 665 (M.D.Fla.1974). In other words, the intent was to cover, as much as possible, all waters of the United States instead of just some.

Notably, the Corps—which has also been delegated the task of administering this program, *see* 33 C.F.R. § 323.5 (1980)— defines "waters of the United States" to include "adjacent wetlands," 33 C.F.R. § 323.2 (1980), and the courts have been in agreement.[5] *See, e. g., Avoyelles Sports-*

---

the Secretary of the Army; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of War prior to beginning the same.

**3.** "High water mark" is a term used to indicate the highest elevation reached by a body of water, whether caused by tides, flooding, or unique climatic conditions. "Mean high water mark" designates the arithmetic average of the

height above mean sea level of all *high* tides over a period of approximately 18.6 years.

**4.** Section 404(a) provides: "The Secretary [of the Army, acting through the Chief of Engineers,] may issue permits, after notice and opportunity for public hearings for the discharge of dredged or fill material into the navigable waters at specified disposal sites." The companion provision, Section 301(a), reads: "Except as in compliance with this section and section ... 404 of this Act, the discharge of any pollutant by any person shall be unlawful."

**5.** The Corps defines "wetlands" to mean "those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under nor-

men's League v. Alexander, 473 F.Supp. 525, 531, 533 (W.D.La.1979); *Conservation Council v. Costanzo*, 398 F.Supp. 653, 674 (E.D.N.C.), *affirmed*, 528 F.2d 250 (1975); *United States v. Holland*, 373 F.Supp. 665, 673–674 (M.D.Fla.1974).

The FWPCA establishes a comprehensive program of water pollution research and control in order to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters" and, among other things, declares as a national goal the elimination of the discharge of pollutants into navigable waters by the year 1985. 33 U.S.C. § 1251(a)(1) (1976); *see, e.g., Train v. New York*, 420 U.S. 35, 37, 95 S.Ct. 839, 841, 43 L.Ed.2d 1 (1975); *United States v. Earth Sciences, Inc.*, 599 F.2d 368, 372–373 (10th Cir. 1979). Further, "a basic policy of the FWPCA is the protection of our nation's wetlands and the important functions they serve." *Avoyelles Sportsmen's League v. Alexander*, 473 F.Supp. 525, 533 (W.D.La. 1979).

3. *The implementing regulations* adopted by the Corps of Engineers pursuant to its statutory authority have grown increasingly complex and rigorous since the late 1960's.[6] This, for us, is the key legal event in the case at bar.

Until 1968, the Corps administered the Rivers and Harbors Act solely in the interest of navigation and the navigable capacity of the nation's waters. However, on December 18, 1968, in response to a growing national concern for environmental values and related federal legislation, the Corps revised its regulations to implement a new type of review termed "public interest review." Besides navigation, the Corps would consider the following additional factors in reviewing permit applications: fish and wildlife, conservation, pollution, aesthetics, ecology, and the general public interest.[7]

On April 4, 1974, the Corps published further revised regulations so as to:

a) incorporate new permit programs under Section 404 of the FWPCA;

b) incorporate the requirements of new federal legislation[8] by adding to the factors to be weighed in the public interest review, including: economics; historic values; flood damage prevention; land-use classification; recreation; water supply and water quality;

c) adopt further criteria to be considered in the evaluation of each permit application, including the desirability of using appropriate alternatives; the extent and permanence of the beneficial and/or detrimental effects of the proposed activity; and the cumulative effect of the activity when considered in relation to other activities in the same general area;

---

mal circumstances do support, a prevalence of vegetation typically adapted for life in saturated soil conditions." 33 C.F.R. § 323.2(c) (1980). The regulation indicates that "[w]etlands generally include swamps, marshes, bogs and similar areas." *Id.*

6. This short history is drawn from a general discussion of Corps regulation appearing at 42 Fed.Reg. 37122–37164 (1977).

7. The "public interest review" received its first judicial test in *Zabel v. Tabb*, 430 F.2d 199 (5th Cir. 1970), *cert. denied*, 401 U.S. 910, 91 S.Ct. 873, 27 L.Ed.2d 808 (1971), in which the court upheld the denial by the Corps of a landfill permit for fish and wildlife reasons (and not reasons related to navigation). In reaching its decision, the court reaffirmed the Department of the Army's position that it was "acting under a Congressional mandate to collaborate and consider all of these factors" when it reached its decision. The court stated:

Governmental agencies in executing a particular statutory responsibility ordinarily are required to take heed of, sometimes effectuate and other times not thwart other valid statutory governmental policies. And here the government-wide policy of environmental conservation is spectacularly revealed in at least two statutes, the Fish and Wildlife Coordination Act and the National Environmental Policy Act of 1969. [*Id.* at 209.]

8. Among others: The Federal Water Pollution Control Act Amendments of 1972; Marine Protection, Research and Sanctuaries Act of 1972; Marine Mammal Protection Act of 1972; Coastal Zone Management Act of 1972; Endangered Species Act of 1973; Flood Disaster Protection Act of 1973; Historical Preservation Act of 1974; Deepwater Port Act of 1974. *See* 33 C.F.R. §§ 320.2–320.3 (1980).

d) institute a full-fledged wetlands policy to protect wetlands subject to the Corps' jurisdiction from unnecessary destruction.

The inauguration of the wetlands policy should especially be noted, as it plays a leading role in the forthcoming scenario.

The last general revision of Corps regulations occurred on July 19, 1977. The purpose was merely to simplify and reorganize the existing body of rules to make them more understandable. The finished product appears at 33 C.F.R. §§ 320.1–329.16 (1980).

B. Facts.

In 1964, plaintiff, Deltona, purchased for $7,500,000 a 10,000 acre parcel on the Florida Gulf coast with the intention of developing a water-oriented residential community, Marco Island. The property, then completely undeveloped, lay astride the mean high water mark and contained large areas of dense mangrove vegetation, including wetlands. Deltona's master plan called for more than 12,000 single family tracts, numerous multifamily sites, school and park areas, shopping districts, marinas, beaches and regular utilities. Structurally, the project revolved about the "finger-fill" or "landfinger" concept and would necessitate considerable dredging and filling as well as the permanent destruction of much of the natural mangrove vegetation.

Deltona divided Marco Island into five construction or permit areas to be built consecutively. These five areas, in order of scheduled completion, were Marco River, Roberts Bay, Collier Bay, Barfield Bay and Big Key. Each separate stage would take three to four years to complete. While partitioned for these limited purposes, in operation, the Marco Island community would be a thoroughly integrated, unified whole.

Because Deltona's proposed dredge and fill activities were to take place in "navigable waters of the United States" as that term is used in the Rivers and Harbors Act, it was required to obtain the proper permit from the Army Corps of Engineers before any of the work could legally get underway in 1964. Also, because its proposed dredge and fill activities were to take place in "navigable waters" as used in the FWPCA, Deltona was required after 1972 to obtain a permit from the Army Corps under that statutory scheme as well. Deltona's problems which culminated in the instant lawsuit stem from its inability to obtain all the permits which it needs to complete its project.

When in 1964 Deltona applied for a dredge and fill permit for the Marco River area, the Corps' policy, as we have seen, was merely to consider the likely adverse impact which issuance would have upon navigation. *See supra* at 1188. In this case, the Corps routinely granted the necessary permit on October 27, 1964.

The second construction area was Roberts Bay. Deltona obtained its dredge and fill permit on December 18, 1969, this time pursuant to the so-called "public interest review" which had been adopted by the Corps a year earlier. *See supra* at 1188. The permit, however, was issued subject to the following express conditions: first, Deltona's "understand[ing] that all permit applications are independent of each other and that the granting of this permit does not necessarily mean that future applications for a permit or permits in the general area of the proposed work by Marco Island Development Corporation or others will be similarly granted;" second, its "agree[ment] . . . not [to] advertise or offer for sale as suitable building lots parcels of land which (1) are in whole or in part seaward of the mean high water line and which (2) could not be made suitable for the erection of residences or other structures in the absence of a Department of the Army fill permit that has not yet been issued."

Deltona applied for Corps of Engineers dredge and fill permits for the Collier Bay, Barfield Bay, and Big Key construction areas on April 9, 1973. By this time, the permit requirement imposed by § 404 of the FWPCA had been added to that already imposed by § 10 of the Rivers and Harbors Act. In a written decision dated April 15, 1976, the Chief of Engineers denied Deltona's application to dredge and fill in Bar-

field Bay and Big Key, while granting its application for Collier Bay.

The permit denials were premised upon "overriding national factors of the public interest." The decision indicated that "Corps regulation[s] . . . identify certain types of wetlands considered to perform functions important to the public interest."

These include wetlands that serve important natural biological functions (including food chain production, general habitat, and nesting, spawning, rearing and resting sites for aquatic or land species); wetlands set aside as sanctuaries or refuges; wetlands which are significant in shielding other areas from wave action, erosion, or storm damage (including barrier beaches); and wetlands that serve as valuable storage areas for storm and flood waters.

The decision continued: "A review of the permit file clearly indicates that the mangrove wetlands involved in these permit applications fulfill each of these functions in a most significant way." Consequently, under governing regulations, denial of the permits was mandated unless it could be shown that "the benefits of the proposed alteration . . . outweigh[ed] the damage to the wetlands resource, and that the proposed alteration [was] necessary to realize those benefits." The Chief of Engineers concluded that Deltona had failed to make the requisite factual showing as to both elements.[9]

By contrast, "[t]he permit file reveal[ed] that a significant amount of destruction ha[d] already occurred to the mangrove wetlands associated with the Collier Bay

application" and that a "considerable amount of dredging and filling" had taken place, resulting in the creation of a large number of lots and approximately forty homes.[10] The Chief of Engineers wrote: "It is my position, therefore, that this area has been already so dedicated to development that it would no longer be in the public interest to preclude completion of that development."

Deltona quickly filed suit in federal district court challenging the legality of the permit denials under the Administrative Procedure Act, 5 U.S.C. §§ 701–706 (1976). On January 14, 1981, the court ruled that the Corps of Engineers had acted reasonably and lawfully in denying Deltona the permits to dredge and fill in Barfield Bay and Big Key. *Deltona v. Alexander*, 504 F.Supp. 1280 (M.D.Fla.1981). The *validity* of the permit denials is therefore not before this court. Deltona does not take issue with this basic point.

Deltona notes with much vigor that prior to the adverse decision by the Corps of Engineers, it had obtained all the necessary county and state permits to go forward with the development of Barfield Bay and Big Key and had entered into contracts of sale covering approximately 90% of the lots in those two areas.[11] As a practical matter, however, it cannot consummate its plans without the federal permits. The question before this court is whether plaintiff has suffered an uncompensated taking as the consequence of federal regulation. Under the specific facts and circumstances of this case, and the tests enunciated by the courts, we conclude that plaintiff has not.

9. The Corps was also concerned about the possibly adverse precedential impact of allowing Deltona to complete the destruction of the mangrove wetlands located on its property. Note that the administrative file clearly reveals that the proposed dredging and filling would not have had any adverse impact upon commercial navigation, the traditional criterion.

10. The construction had occurred around 1971 at a time when there was some confusion concerning Corps jurisdiction over the particular tract involved. The tract was also closely associated with the more fully developed areas in Marco River and Roberts Bay. Overall, Collier

Bay contained only a very small amount of mangrove vegetation.

11. Under Deltona's plan, individual lots at the Marco Island community were to be purchased from Deltona for cash or on an installment basis, with purchasers making a down payment and subsequent installment payments over various periods of time, depending on the type of lot, location, and payment plan selected by the individual purchaser. In some cases, periodic payments on contracts would extend over a period of time as long as 8½ years from the date of sale.

## II. ANALYSIS

### A. Basic Constitutional Principles.

█ The Just Compensation Clause of the Fifth Amendment provides: "[N]or shall private property be taken for public use, without just compensation." We have stated that, "[p]roof of damage alone does not necessarily prove a taking." *Yazel v. United States,* 118 Ct.Cl. 59, 72, 93 F.Supp. 1000, 1003 (1950). Instead, " 'Only consummated acts which actually deprive an owner of property . . . of valuable existing property rights, or acts so definite in character as to . . . place [on the property] . . . a permanent servitude not theretofore existing' " may form the basis for taking. *Id., quoting, Matthews v. United States,* 87 Ct.Cl. 662, 721 (1938).

The ordinary taking occurs when a governmental entity formally condemns a landowner's property and obtains the fee simple pursuant to eminent domain proceedings. The courts, however, have often found takings outside the context of formal condemnation proceedings or transfers of fee simple, in cases where governmental action benefiting the public resulted in destruction of the use and enjoyment of real property. *See, e. g., Kaiser Aetna v. United States,* 444 U.S. 164, 178–180, 100 S.Ct. 383, 392–393, 62 L.Ed.2d 332 (1979) (navigational servitude allowing public right of access); *United States v. Dickinson,* 331 U.S. 745, 750–751, 67 S.Ct. 1382, 1385–1386, 91 L.Ed. 1789 (1947) (property flooded because of government dam project); *United States v. Causby,* 328 U.S. 256, 261–262, 66 S.Ct. 1062, 1065–1066, 90 L.Ed. 1206 (1946) (frequent low altitude flights of Army and Navy aircraft over property). The cause of action then alleged is inverse condemnation.[12]

█ It is well established as a matter of law that government regulation can effect a Fifth Amendment taking. *See, e. g., Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 123, 98 S.Ct. 2646, 2658, 57 L.Ed.2d 631 (1978) (no taking found on the specific facts of that case); *Benenson v. United States,* 212 Ct.Cl. 375, 388, 390, 548 F.2d 939, 947, 948 (1977) (taking found). The rationale, as stated by Justice Brennan, is that "[p]olice power regulations such as zoning ordinances and other land-use restrictions can destroy the use and enjoyment of property in order to promote the public good just as effectively as formal condemnation or physical invasion of property." *San Diego Gas & Electric Co. v. San Diego,* 450 U.S. 621, 652, 101 S.Ct. 1287, 1304, 67 L.Ed.2d 551 (1981) (Brennan, J., dissenting).[13] While, "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law," *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 413, 43 S.Ct. 158, 159, 67 L.Ed. 322 (1922), the principle generally applied is that "if regulation goes too far it will be recognized as a taking," *id.* at 415, 43 S.Ct. at 160; *see San Diego Gas, supra,* 450 U.S. at 650, 101 S.Ct. at 1303.

### B. The Crucial Factor Herein and the Parties' Positions.

The crucial factor in this case is that since the late 1960's the regulatory jurisdiction of the Army Corps of Engineers has substantially expanded pursuant to § 404 of the FWPCA and—under the spur of steadily evolving legislation—the Corps has greatly added to the substantive criteria governing the issuance of dredge and fill permits within its jurisdiction. Recall that when Deltona initially purchased the Marco Island property in 1964, the regulatory jurisdiction of the Corps was limited to "navigable waters of the United States" and the

---

**12.** The term inverse condemnation refers to a cause of action by which "a landowner recovers just compensation for a taking of his property when condemnation proceedings have not been instituted." *United States v. Clarke,* 445 U.S. 253, 257, 100 S.Ct. 1127, 1130, 63 L.Ed.2d 373 (1980).

**13.** Justices Stewart, Marshall, and Powell joined Justice Brennan's dissent; Justice Rehnquist, writing separately, expressed general agreement with Justice Brennan's discussion of taking law. The opinion of the Court did not reach the issue addressed by Justice Brennan.

lone substantive criterion for the issuance of Corps dredge and fill permits was the likely adverse impact upon navigation. Pursuant to this relatively undemanding standard, Deltona routinely succeeded in 1964 in obtaining the first permit for which it applied. By 1976, when the Barfield Bay and Big Key applications were denied, the situation had been radically transformed. The Corps' jurisdiction now extended to all "navigable waters" and the substantive criteria for granting permits had been significantly stiffened. Deltona's particular stumbling block, as we have seen, was its inability to satisfy the Corps' recently inaugurated wetlands protection policy. The impact is self-evident. As the result of an unforeseen change in the law, Deltona is no longer able to capitalize upon a reasonable investment-backed expectation which it had every justification to rely upon until the law began to change.

Deltona's position in this litigation is as follows. First, it claims that it has been deprived of all economically viable use of its land. Second, it argues that even if this factual assertion is rejected, it has undeniably been deprived of the highest and best economic use of its land and that this constitutes a taking.

The Government's position is quite the opposite. It maintains that Deltona has not been denied all economically viable use of its land and that Deltona's argument respecting "highest and best use" has no basis in the law. The Government generally asserts that whatever detrimental impact Deltona may have suffered, the injury falls well short of what is necessary to constitute a taking.

C. Tests for Determining Whether Regulation Effects a Taking.

██ "The determination that governmental action constitutes a taking is, in essence, a determination that the public at large, rather than a single owner, must bear the burden of an exercise of state power in the public interest." *Agins v. City of Tiburon*, 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980). It is frequently stated that the question whether a particular restriction effects a taking depends largely upon the particular circumstances of the case. *See, e. g., Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978). Generally speaking, the Just Compensation Clause preserves governmental power to regulate, subject to the dictates of "justice and fairness." *Andrus v. Allard*, 444 U.S. 51, 65, 100 S.Ct. 318, 327, 62 L.Ed.2d 210 (1979); *accord, Penn Central Transp. Co., supra.*

While "[t]he economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations are, of course, relevant considerations," *Penn Central Transp. Co., supra,* the decisions of the Supreme Court "uniformly reject the proposition that diminution in property value, standing alone, can establish a 'taking.' " *Id.* at 131, 98 S.Ct. at 2663 *citing, Euclid v. Ambler Realty Co.,* 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926) (75% diminution in value caused by zoning law); *Hadacheck v. Sebastian,* 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915) (87.5% diminution in value). Similarly, the Court has branded as fallacious the "contention that a 'taking' must be found to have occurred whenever the land-use restriction may be characterized as imposing a 'servitude' on the claimant's parcel." *Penn Central Transp. Co., supra,* 438 U.S. at 130 n.27, 98 S.Ct. at 2662 n.27. Instead, "the 'taking' issue in these contexts is resolved by focusing on the uses the regulations permit." *Id.,* 438 U.S. at 131, 98 S.Ct. at 2663. In one of its most recent pronouncements, the Court crystallized its thinking as follows: "The application of a general zoning law to particular property effects a taking if the ordinance does not substantially advance legitimate state interests ... or denies a[n] owner economically viable use of his land ...." *Agins v. City of Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980); *accord, Hodel v. Virginia Surface Mining and Reclamation Ass'n,* —— U.S. ——, ——, 101 S.Ct. 2352, 2370, 69 L.Ed.2d 1 (1981); *Penn Central Transp. Co., supra,* 438 U.S. at 138,

98 S.Ct. at 2666; *Benenson v. United States*, 212 Ct.Cl. 375, 388–389, 548 F.2d 939, 947–948 (1977). *See also Schad v. Borough of Mount Ephraim*, —— U.S. ——, ——, 101 S.Ct. 2176, 2182, 68 L.Ed.2d 671 (1981). The *Agins* Court also commented that "the question necessarily requires a weighing of private and public interests." *Id.*, 447 U.S. at 261, 100 S.Ct. at 2141.

In applying the foregoing considerations, it is important to bear in mind the Supreme Court's admonition:

"Taking" jurisprudence does not divide a single parcel into discrete segments and attempt to determine whether rights in a particular segment have been entirely abrogated. In deciding whether a particular governmental action has effected a taking, this Court focuses rather both on the character of the action and on the nature and extent of the interference with rights in the parcel *as a whole* . . . .

*Penn Central Transp. Co., supra*, 438 U.S. at 130–131, 98 S.Ct. at 2662 (emphasis supplied).

**D. Application of These Tests to the Case at Bar.**

■ In this case, we take as given that the revisions in the implementing regulations of the Army Corps of Engineers, and the entire body of federal navigational and environmental laws to which they give effect, substantially advance legitimate and important federal interests. We have every reason to believe that the Corps has been enforcing these new regulations on a uniform basis nationwide. Deltona will therefore share with other landowners both the benefits and burdens of the Government's exercise of its Commerce Clause powers. In assessing the fairness of the regulations, "these benefits must be considered along with any diminution in market value" which Deltona might suffer. *Agins, supra*, 447 U.S. at 262, 100 S.Ct. at 2142.

■ Although we have accepted that the expansion of the Corps' regulatory jurisdiction and the stiffening of its requirements for granting permits have substantially frustrated Deltona's reasonable investment-backed expectation with respect to Barfield Bay and Big Key, this development neither "extinguish[es] a fundamental attribute of ownership," *id.*, nor prevents Deltona from deriving many other economically viable uses from its parcel—however delineated. Indeed, the residual economic value of the land is enormous, both proportionately and absolutely. A few statistics will suffice. In the aggregate, Barfield Bay and Big Key contain only 20% of the total acreage of Deltona's original purchase in 1964 and 33% of the developable lots. All the necessary federal permits for the development of the remainder of Marco Island—Marco River, Roberts Bay, and Collier Bay—have been granted. If we focus solely upon the three construction areas which became subject to the new federal restrictions promulgated during the early 1970's—Collier Bay, Barfield Bay, and Big Key—the salient fact emerges that while Deltona has been blocked from going forward at Barfield Bay and Big Key, it has obtained all the necessary clearances for Collier Bay, a tract approximately 25% of the three areas together. Most striking, even within Barfield Bay and Big Key, there are located 111 acres of uplands which can be developed without obtaining a Corps permit and whose total market value is approximately $2.5 million. Deltona only paid $1.24 million for all of Barfield Bay and Big Key in 1964.[14]

Therefore, in the terms of *Agins, supra*, the statutes and regulations at issue in this case substantially advance legitimate and important governmental interests and do not deprive Deltona of the economically viable use of its land. Instead, Deltona's remaining land uses are plentiful and its residual economic position very great. Reduced to its essentials, this case merely presents an instance of some diminution in

---

**14.** Deltona also possesses Transferable Development Rights (TDR's) granted by the county. According to the *Penn Central* case, *supra*, 438 U.S. at 137, 98 S.Ct. at 2666, such rights "miti-gate whatever financial burdens the law . . . impose[s] . . . and, for that reason are to be taken into account in considering the impact of regulation."

value. The Supreme Court, however, has squarely held that mere diminution, standing alone, is insufficient to establish a taking. *See Penn Central Transp. Co., supra,* 438 U.S. at 131, 98 S.Ct. at 2662. Thus, "it cannot be said that the impact of general landuse regulations has denied [plaintiff] the 'justice and fairness' guaranteed by the Fifth ... Amendment ...." *Agins, supra,* 447 U.S. at 263, 100 S.Ct. at 2142.

Moreover, when Deltona acquired the property in 1964, it knew that the development it contemplated could take place only if it obtained the necessary permits from the Corps of Engineers. Although at that time Deltona had every reason to believe that those permits would be forthcoming when it subsequently sought them, it also must have been aware that the standards and conditions governing the issuance of permits could change. Deltona had no assurance that the permits would issue, but only an expectation. Indeed, five years after Deltona acquired the property, it was given notice that its expectancy might never come to fruition when it was told, in connection with the issuance of the permit for Roberts Bay, that "the granting of this permit does not necessarily mean that future applications for permit or permits in the general area of the proposed work by Marco Island Development Corporation or others will be similarly granted."

In *Penn Central Transp. Co., supra,* the Supreme Court rejected as "quite simply untenable" the contention that property owners "may establish a 'taking' simply by showing that they have been denied the ability to exploit a property interest that they heretofore had believed was available for development ...." *Supra,* 438 U.S. at 130, 98 S.Ct. at 2662. That is precisely this case. Deltona has been denied the ability to exploit its property by constructing a project that it theretofore had believed "was available for development."

■  While plaintiff may very well be correct in its alternative assertion that it has been denied the highest and best economic use for its property, it is obvious from the Supreme Court tests we have cited that such an occurrence does *not* form a sufficient predicate for a taking. In effect, the "highest and best use" argument is merely another way of saying that there has been some diminution in value, rather than the complete destruction of all economically viable uses of the property. The Court, however, clearly rejects the notion that diminution in value, by itself, can establish a taking. Notwithstanding the changed phraseology, plaintiff's alternative argument fails as a matter of law. *See, e. g., Carruth v. United States,* 224 Ct.Cl. ——, ——, 627 F.2d 1068, 1081 (1980); *William C. Haas & Co. v. City and County of San Francisco, Calif.,* 605 F.2d 1117, 1120 (9th Cir. 1979), *cert. denied,* 445 U.S. 928, 100 S.Ct. 1315, 63 L.Ed.2d 761 (1980); *Oceanic California, Inc. v. City of San Jose,* 497 F.Supp. 962, 975 n.20 (N.D.Cal.1980).

In *Agins, supra,* after the appellants therein acquired five acres of unimproved land in the city of Tiburon, California, for residential development, the city adopted new ordinances that modified existing zoning requirements. In particular, density restrictions permitted the appellants to build only between one and five single-family residences on their five-acre tract. Appellants then filed an inverse condemnation action, alleging in the complaint that land in Tiburon had greater value than any other suburban property in California and that the ridgelands owned by appellants "possess magnificent views of San Francisco Bay and the scenic surrounding areas [and] have the highest market values of all lands" in Tiburon. Rezoning "forever prevented [its] development for residential use ...." In consequence, the city had "completely destroyed the value of [appellants'] property for any purpose or use whatsoever ...." *Id.,* 447 U.S. at 258, 100 S.Ct. at 2140. Upon appeal from rejection of the inverse condemnation claim at the state court level, the United States Supreme Court affirmed, holding that there had been no taking. It stressed the substantial governmental interests served by the zoning law and the fact that appellants were still permitted to build as many as five houses in the area. *Id.,* 447

U.S. at 261–262, 100 S.Ct. at 2141–2142. *Agins* well illustrates the very difficult prospect which any plaintiff faces in a regulatory taking case. We find nothing in the case at bar which would justify a different result than that in *Agins.*

We are not insensitive to the fact that the permit denials have placed Deltona in a highly difficult situation, legally and financially. The Fifth Amendment, however, does not provide a solution. In addition, Deltona certainly bears a great deal of responsibility for its current plight by having rushed into many land sale contracts before having obtained all the necessary federal permits which would enable it to meet its obligations. Note that Deltona had been specifically warned against this when it obtained its Roberts Bay permit in 1969.[15]

In sum, we have rejected plaintiff's argument that the denial of highest and best use can constitute a taking. We have found that subsequent to Deltona's purchase of the land in question, a significant change occurred in the statutes and regulations affecting its land-use, and that this development did have a significant impact upon the values incident to Deltona's Marco Island property. However, in view of the many remaining economically viable uses for plaintiff's property, and the substantial public benefits which the new statutes and regulations serve to bring about, we have concluded that no taking occurred.[16]

### III. CONCLUSION OF LAW

The court concludes as a matter of law that plaintiff is not entitled to recover, and the petition is dismissed.[17]

---

**15.** Because of our ultimate disposition of this cause, it is unnecessary to consider the impact of the federal navigational servitude upon the issues herein. *See generally Kaiser Aetna v. United States,* 444 U.S. 164, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979).

**16.** All other arguments raised by plaintiff, although not directly addressed by this opinion, have been considered and found to be without merit.

**17.** In a highly related context, *see Jentgen v. United States,* 657 F.2d 1210, Ct.Cl. (1981), issued the same date as this opinion.