Hazel Pierre **DUFAU, et al, Plaintiffs,**

v.

The **UNITED STATES, Defendant.**

No. 553–89L.

United States Claims Court.

Nov. 30, 1990.

Michael F. Little, Metairie, Louisiana, for plaintiffs. Lydia J. Alford, Metairie, La., of counsel.

Dorothy Burakreis, Washington, D.C., for defendant.

## OPINION

LYDON, Senior Judge:

This fifth amendment regulatory taking case is before the court on defendant's motion to dismiss plaintiffs' complaint, or alternatively, for summary judgment, and plaintiffs' opposition thereto. Plaintiffs allege their land has been taken as a result of unreasonable government actions in processing plaintiffs' permit applications to fill wetlands for development and sale. Defendant asserts that, since plaintiffs received the permits they requested, which allowed them to develop their land, no taking has transpired. After careful consideration of the parties' submissions, the parties having waived oral argument, the court grants defendant's motion for summary judgment.

## FACTS

Plaintiff landowners, Mr. and Mrs. Clement J. Dufau and others [sometimes referred to collectively as "Dufau"], claim that their real property has been taken by the federal government without just compensation, in violation of the fifth amendment to the Constitution.[1] Plaintiffs own approximately 112 acres of land located about two miles northeast of the town of Laplace, Louisiana, in the parish of St. John the Baptist. Plaintiffs' land is situated between Woodland Drive and Interstate 10, and is bisected by U.S. Highway 51. As owners or successors in interest, plaintiffs have maintained their ownership interests in and have been in continuous possession of the land at issue since at least 1968. Since 1974, the land has been the subject of plaintiffs' continuing and ongoing plans for commercial and residential development.

In 1972, Congress amended the Clean Water Act (CWA), 33 U.S.C. § 1251 et seq., to prohibit, inter alia, the discharge of dredged or fill materials into "navigable waters" (defined as "waters of the United States") unless authorized by permit issued by the Army Corps of Engineers (Corps), pursuant to section 404 of the CWA. See 33 U.S.C. §§ 1344, 1311, 1362. Before 1975, this provision did not extend to "wetlands" such as plaintiffs' land. However,

---

1. The fifth amendment prohibits the federal government from taking "private property ... for public use without just compensation."

in 1975 the Corps issued interim final regulations redefining "waters of the United States" to include not only "navigable waters" but also tributaries of such waters, interstate waters and their tributaries, and nonnavigable intrastate waters whose use or misuse could affect interstate commerce. 40 Fed.Reg. 31320 (1975). The Corps also construed the Clean Water Act to cover all "freshwater wetlands" adjacent to other waters covered by the Act, defined as including areas "periodically inundated" and "normally characterized by the prevalence of vegetation that requires saturated conditions for such growth and reproduction." 33 C.F.R. § 209.120(d)(2)(h) (1976). In 1977, the Corps eliminated the requirement of "periodic inundation" from the definition of "wetlands" and made other minor changes, as follows:

> The term "wetlands" means those areas that are inundated or saturated by surface or ground water at a frequency and duration sufficient to support, and that under normal conditions do support, a prevalence of vegetation typically adapted for life in saturated soil conditions. Wetlands generally include swamps, marshes, bogs and similar areas.

33 C.F.R. § 323.2(c) (1978).

In 1982, the 1977 regulations were replaced by substantively identical regulations that were in force in May 1984 when the Corps issued plaintiffs a cease and desist order with regard to "[d]eposition of dredged and/or fill material into a water of the United States." See 33 C.F.R. § 323.2 (1985). These regulations, as construed by the Corps to cover freshwater wetlands such as plaintiffs' land, have been upheld by the Supreme Court as within the Corps' jurisdiction. *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 131, 106 S.Ct. 455, 461, 88 L.Ed.2d 419 (1985).[2]

In 1974, the New Orleans District of the Corps advised Dufau that no § 404 permit was needed to fill the area encompassed by plaintiffs' land, based on regulations in force at the time. Dufau claims he received the same advice from the Corps indirectly in 1979. Interestingly, the District Corps has no record of any inquiry from Dufau regarding the Corps' § 404 jurisdiction over Dufau's land in 1974 or at any time prior to the May 1, 1984 cease and desist order. However, the administrative record seems to support Dufau's claim that he received such advice from the Corps in 1974. In 1974, the Corps also advised H. Hunter White, who owned land adjacent to plaintiffs' land, that the Corps had no § 404 jurisdiction above high tide.[3] Accordingly, in 1974, plaintiffs claim to have begun to invest significant amounts of time and money in formulating extensive plans for the development and future sale of their land, in reliance on the Corps' assurance that no permit was needed to fill the land.[4]

On April 23, 1984, a Corps botanist, Dr. Mary Plumb–Mentjes and Bert Duplantis, a permit investigator, observed land clearing

---

**2.** Regulations generally have the force and effect of law. *See G.L. Christian & Assocs. v. United States*, 160 Ct.Cl. 58, 65, 320 F.2d 345, 350 (1963); *Woods Psychiatric Institute v. United States*, 20 Cl.Ct. 324, 331 (1990) ("Regulations reasonably adapted to the administration of a Congressional act, and not inconsistent with any statute, have the force and effect of law").

**3.** In 1979, the Louisiana Department of Transportation made inquiry as to whether a permit was required relative to work on the U.S. Highway 51 project, and was advised by the Corps that the area along U.S. Highway 51 consisted of mixed wetlands and nonwetlands. Highway 51 bisects the land at issue here. On May 13, 1983, in connection with the U.S. Highway 51 project, a botanist from the Corps, Dr. Linda Glenboski, made an in-house determination that plaintiffs' land contained a mixture of wetlands and non-

wetlands, consisting of ridges and swales (low places in tract of land that are usually more moist than higher ground). In July of 1983 the Department of Transportation applied for the necessary permit. On September 14, 1983, the mixed wetlands and nonwetlands characterization of plaintiffs' land was confirmed by another Corps botanist, Dr. Mary Lee Plumb–Mentjes. The Corps issued the necessary permit to the Department of Transportation relative to the wetlands portion of the Highway 51 project.

**4.** To the extent that plaintiffs rely on this advice from the Corps regarding the state of the law to support an estoppel argument, which plaintiffs have not raised, such reliance would be unfounded on the materials before the court. *See Office of Personnel Management v. Richmond*, — U.S. —, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990).

and fill operations on plaintiffs' land, which activities led the Corps to issue plaintiffs a cease and desist order on May 1, 1984.[5] Plaintiffs' activities and the cease and desist order are documented by a memorandum to file dated May 2, 1984. Subsequent memoranda dated July 13, 1984 and July 18, 1984 document Dr. Plumb–Mentjes' wetlands determinations with regard to plaintiffs' land. Dr. Plumb–Mentjes found that, of approximately 120 acres of plaintiffs' land, about 70 acres were wetlands and about 50 acres were nonwetlands.[6]

■ Plaintiffs do not challenge the Corps' characterization of 70 acres of their land as wetlands. Rather, plaintiffs' position is, in essence, that in 1984 when they began to clear and fill the 112 acres, they relied on the state of the law as it existed before 1975, at a time when the Corps did not construe the Clean Water Act to include plaintiffs' land in the definition of "wetlands." Plaintiffs complain that the government did not notify them when the law changed to include plaintiffs' land in the definition of "wetlands." However, the government has no duty generally to disclose changes in the law. *See C & L Construction Co. v. United States*, 6 Cl.Ct. 791, 799 (1984), *aff'd*, 790 F.2d 93 (Fed.Cir.1986). Plaintiffs are not entitled to rely on pre–1975 law in 1984 nor on any government assurances made in 1974. Rather, plaintiffs should have ascertained for themselves whether their development activities in 1984 comported with federal laws and regulations in effect in 1984. *See C & L Construction, supra*, 6 Cl.Ct. at 797 (the rule of law is that " 'everyone is charged with the knowledge of the United States Statutes at Large' ") (quoting *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947)).

Moreover, the Supreme Court has upheld the Corps' construction of the Clean Water Act and its regulations to include, after 1975, freshwater wetlands such as plaintiffs' 70 acres. *Riverside Bayview Homes, supra*, 474 U.S. at 131, 106 S.Ct. at 461.

By letter dated September 28, 1984, the Corps advised Dufau to submit an after-the-fact § 404 permit application. Although the letter included permit application forms, it neglected to inform Dufau that he had only 30 days in which to apply for the permit. The Corps acknowledged this failure in a letter dated November 2, 1984 to Dufau, and the Corps gave Dufau an additional 20 days in which to submit the application.

On November 13, 1984, Dufau submitted his after-the-fact permit application to the Corps to "clear, grub, fill and grade" the land at issue. The Corps docketed plaintiffs' application on December 7, 1984. By letter dated January 18, 1985, the Corps requested from Dufau additional information in order to process his permit application. Dufau complied with this request by letter dated January 23, 1985.

The permit application was noticed for public comment on May 8, 1985. During the application process, Dufau agreed to set aside 13 acres of bottomland hardwood as partial mitigation for clearing and filling about 57 acres of wetlands.[7] Dufau claims he agreed to the mitigation only because the Corps advised him that no permit would be issued without such mitigation, due to objections from federal and state wildlife and environmental agencies. As further mitigation, Dufau also agreed to make a $3,700 contribution to the Pointe au Chien Wildlife Management Area Project, to beneficially affect approximately 1,000 acres of wetland habitat. The mitigation propos-

---

**5.** When Dufau began clearing and fill activities on his land in 1984, he relied on the 1974 and 1979 Corps determinations that the land was not wetlands. Such reliance may have been ill-advised, however. Since at least the early 1980's, the New Orleans District of the Corps has considered a determination of wetlands to be accurate for no more than three years, due in part to changes in the hydrology of the land. *See Florida Rock Indus., Inc. v. United States*, 21 Cl.Ct. 161, 164 (1990) (Corps would not consider appli-

cations for permit to fill wetlands covering more than three years).

**6.** It is undisputed that plaintiffs' land consists of approximately 112 acres, not 120 acres.

**7.** The U.S. Fish and Wildlife Service uses the term "mitigation" to mean "the implementation of habitat management/improvement measures."

al had to be negotiated among the Corps, the various federal and state agencies involved, and Dufau.[8] Due to objections from various federal and state agencies to the permit application, the mitigation negotiation process spanned some ten months, from May of 1985 through March of 1986. It is not unreasonable to surmise that Dufau may have contributed to the length of the permit application process by his admitted unwillingness to perform the mitigation required by the various agencies. The Corps issued to plaintiffs an after-the-fact permit on March 25, 1986, about fifteen and a half months after the permit application was docketed on December 7, 1984.[9]

After Dufau received the permit to develop 57 acres of wetlands, he proceeded to harvest the timber from the 13–acre parcel he had agreed to set aside for mitigation, after having been advised by the Corps that no permit was required for harvesting timber with chainsaws. On November 6, 1986, Dufau applied for a permit to fill and develop the 13 acres. The Corps docketed his application on December 10, 1986, and issued the second permit about nine months later, on September 9, 1987. For the second permit, the federal and state agencies involved required Dufau to supply and install a culvert on the Pearl River Wildlife Management Area as mitigation. Plaintiffs spent about $1,995.36 on this mitigation, since their admitted mitigation costs for both projects total $5,695.36. On March 10, 1986, Dufau sent a letter thank-

ing the Corps for "pushing the project through to conclusion." [10]

On October 13, 1989, plaintiffs filed suit in the Claims Court alleging a permanent taking of their property by the government, as a result of the Corps' exercise of § 404 jurisdiction over their land. Accordingly, plaintiffs claim they have been damaged in the sum of $8 million for development and mitigation costs. On September 14, 1990, defendant filed a motion to dismiss plaintiffs' complaint for failure to state a claim, or alternatively, for summary judgment. In plaintiffs' opposition to defendant's dispositive motions, plaintiffs allege they have suffered both a temporary and a permanent taking. The temporary taking allegedly occurred as a result of the delay in processing plaintiffs' § 404 permit application for the 57 acres. The permanent taking allegedly arose because the Corps did not identify which 70 acres of plaintiffs' 112 acre tract is wetlands, and which 42 acres is nonwetlands.

## DISCUSSION

This taking claim is before the court on defendant's dispositive motions. Defendant has moved to dismiss plaintiffs' complaint for failure to state a claim upon which relief can be granted, pursuant to RUSCC 12(b)(4), on the grounds that plaintiffs were granted the two § 404 permits they requested, which allowed plaintiffs to fill all wetlands necessary for their development plans. In the alternative, defen-

8. For example, in May of 1985 the Corps received a letter from the Louisiana Department of Health and Human Resources objecting to plaintiffs' permit application. In July of 1985, the Corps received a letter of objection from the United States Environmental Protection Agency (EPA). On January 29, 1986, the United States Fish & Wildlife Service recommended to the Corps not to issue plaintiffs a permit without mitigation. In an effort to induce the agencies to withdraw their objections to plaintiffs' permit application, Dufau submitted revised project drawings which deleted 13 acres from the project. After the agencies and Dufau had worked out a satisfactory mitigation arrangement, letters of no objection to plaintiffs' § 404 permit application were sent from the Fish and Wildlife Service and the EPA to the Corps on March 18 and March 20, 1986, respectively. A week later, on March 25, 1986, plaintiffs re-

ceived their § 404 permit to fill the 57 acres of wetlands.

9. Defendant points out by way of comparison that it took nearly twelve months to process the after-the-fact permit application of H. Hunter White, an adjacent property owner. White's application initially involved 84 acres of wetlands, but he agreed to withdraw about 53 acres, leaving only 31 acres as the subject of the permit application.

10. The administrative record indicates that the Corps was instrumental in assisting plaintiffs to get approval for the permit from the various federal and state regulatory agencies through mitigation negotiations, a process which spanned ten months, from May of 1985 through March of 1986.

dant moves for summary judgment against plaintiffs, pursuant to RUSCC 56(c), on the grounds that there are no material facts in dispute.

With regard to defendant's motion to dismiss plaintiffs' complaint for failure to state a claim, the Claims Court has recognized that

> [d]ismissing a complaint for failure to state a claim is severe ... [because] plaintiff never receives an opportunity to offer evidence to prove its claim.... Consequently, the court may not dismiss a complaint for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."

*Kinne v. United States,* 21 Cl.Ct. 104, 107 (1990) (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974)).

On the other hand, a summary judgment is a disposition on the merits of the case. *Fidelity & Deposit Co. v. United States,* 2 Cl.Ct. 137, 142 (1983). Summary judgment is appropriate when there are no material facts in dispute, and the moving party is entitled to a judgment as a matter of law. RUSCC 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). However, "only disputes over facts that might affect the outcome of the suit under governing law will properly preclude entry of summary judgment." *Id.* at 248–49, 106 S.Ct. at 2510. Summary judgment may be used to prevent trial if the moving party can show that a "trial would be useless in that more evidence than is already available in connection with its motion could not reasonably be expected to change the result." *Troise v. United States,* 21 Cl.Ct. 48, 60 (1990) (citing *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.,* 739 F.2d 624, 626 (Fed.Cir. 1984)). As the party opposing summary judgment, plaintiffs are entitled to have all doubts over factual issues resolved in their favor. *See Litton Indus. Prod., Inc. v. Solid State Sys. Corp.,* 755 F.2d 158, 163 (Fed.Cir.1985).

Plaintiffs allege both a temporary and a permanent taking of their property as a result of government actions. First, plaintiffs claim that the Corps' unreasonable delay in processing plaintiffs' first § 404 permit application resulted in a temporary taking of 70 acres of plaintiffs' land. In addition, plaintiffs claim that the Corps' refusal to identify which 42 acres of plaintiffs' 112–acre tract is nonwetlands resulted in a permanent taking of those 42 acres. Plaintiffs do not question the Corps' authority to define and regulate wetlands.

Defendant argues that there can be no permanent taking until a permit has been sought and denied. Here, both of plaintiffs' permit requests were granted. Moreover, defendant argues that the Corps did not unreasonably delay the permit process, and any delay involved does not rise to the level of a temporary taking.

The Supreme Court has recognized that, on rare occasions, a governmental land use regulation may affect property in such a manner as to constitute a fifth amendment taking, if the regulation either does not "substantially advance legitimate state interests," or if it "denies an owner economically viable use of his land." *Agins v. Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1980) (citing *Nectow v. Cambridge,* 277 U.S. 183, 188, 48 S.Ct. 447, 448, 72 L.Ed. 842 (1928)); *Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 138 n. 36, 98 S.Ct. 2646, 2666 n. 36, 57 L.Ed.2d 631 (1978). *See also Riverside Bayview Homes, supra,* 474 U.S. at 126, 106 S.Ct. at 458–59; *Loveladies Harbor, Inc. v. United States,* 21 Cl.Ct. 153, 155 (1990).

Plaintiffs do not challenge the exercise of the Corps' § 404 jurisdiction as a substantial advancement of legitimate state interests. Instead, plaintiffs claim they have been denied economically viable use of their land as a result of the Corps' exercise of its § 404 jurisdiction. Federal courts have identified three factors important in the determination of whether there has been a deprivation of the economically viable use of land involved in regulatory taking suits: [1] the character of the

government action; [2] the economic impact of the regulation on plaintiffs; and [3] the extent to which the regulation has interfered with plaintiffs' reasonable investment-backed expectations. *See Connolly v. Pension Benefit Guaranty Corp.,* 475 U.S. 211, 224–25, 106 S.Ct. 1018, 1025–26, 89 L.Ed.2d 166 (1986); *Florida Rock Indus., Inc. v. United States,* 791 F.2d 893, 901 (Fed.Cir.1986), *cert. denied,* 479 U.S. 1053, 107 S.Ct. 926, 93 L.Ed.2d 978 (1987); *Loveladies Harbor, supra,* 21 Cl.Ct. at 155.

## A. Plaintiffs' Permanent Taking Claim

■ Plaintiffs argue they have been permanently deprived of economically viable use of 42 acres of their land, which they claim the Corps refuses to specifically identify as nonwetlands because the nonwetlands acres are intermingled with the wetlands acres. Plaintiffs do not explain how they have been permanently deprived of these acres since plaintiffs received their § 404 permits, which allow plaintiffs to fill, develop and sell all 112 acres of their land.

In *Riverside Bayview Homes, supra,* the Supreme Court upheld the Corps' regulation of freshwater wetlands under its § 404 jurisdiction. The Court noted that the Corps' requirement of a § 404 permit before filling wetlands does not "take" property in any sense. "Only when a permit is denied and the effect of the denial is to prevent 'economically viable' use of the land in question can it be said that a taking has occurred." *Riverside Bayview Homes, supra,* 474 U.S. at 127, 106 S.Ct. at 459.

■ In the present case, the Corps issued to plaintiffs in 1986 a § 404 permit to fill 57 acres of their property designated by the Corps as wetlands. In 1987, plaintiffs received a second § 404 permit to fill the remaining 13 acres of wetlands they had set aside as mitigation for filling the 57

acres. As defendant points out, it is only when a permit has been denied and the effect of the denial is to prevent "economically viable" use of the property can it be said that a taking has occurred. *Riverside Bayview Homes, supra,* 474 U.S. at 127, 106 S.Ct. at 459. *See also Chang v. United States,* 13 Cl.Ct. 555, 558 (1987) (where regulatory taking scheme provides for issuance of permit to engage in otherwise prohibited land uses, plaintiff must be denied permit before he can assert regulatory taking), *aff'd,* 859 F.2d 893 (Fed.Cir.1988); *Conant v. United States,* 12 Cl.Ct. 689, 691 (1987) ("a Fifth Amendment taking claim does not arise until a permit has been denied").

Plaintiffs cannot meet the threshold requirement for a permanent regulatory taking claim because they have not been denied a permit. Moreover, when plaintiffs received their § 404 permits, they were free to go forward with their development plans for the entire 112 acre parcel. Plaintiffs cannot say that any of their land has been permanently "taken" by the government, since the Corps granted both of their § 404 permit requests. Clearly, there has been no permanent taking of plaintiffs' 42 acres of nonwetlands. Moreover, plaintiffs do not deny that, since they received their § 404 permits, they have been free to develop and sell their land for residential and commercial purposes. Plaintiffs cannot reasonably contend that they have been denied economically viable use of their land since the permits were issued.

## B. Plaintiffs' Temporary Taking Claim

■ Plaintiffs allege that they have been temporarily deprived of the economically viable use of 70 acres of their land, and that this temporary taking took place as a result of delay in processing their first § 404 permit application.[11] Unlike a per-

---

**11.** Plaintiffs view the entire delay in the permit process as covering nearly five years, from May 1, 1984, the date of the cease and desist order, until March 16, 1989, which plaintiffs characterize as the date of "final approval." On March 16, 1989, the Corps sent plaintiffs a letter indicating the Corps' final approval of plaintiffs' mitigation projects in connection with their two § 404 permits. In addition, the Corps stated

that it inspected the work authorized by the two § 404 permits, and found the work to be in accordance with the permit plans. Since plaintiffs' first § 404 permit was issued on March 25, 1986, and plaintiffs' second § 404 permit was issued on September 9, 1987, the materials before the court do not support a finding that any "final approval" to fill the wetlands extended beyond those dates, much less until March of

manent taking claim, denial of a permit may not be essential to a temporary taking claim. Nevertheless, plaintiffs correctly recognize that they must prove that substantially all economically viable use of their property has been denied. In *First English Evangelical Lutheran Church v. County of Los Angeles,* 482 U.S. 304, 318, 107 S.Ct. 2378, 2387, 96 L.Ed.2d 250 (1987), the Supreme Court found that a temporary taking "which den[ies] a landowner all use of his property ... clearly requires compensation."

In opposing defendant's motion for summary judgment, plaintiffs are correct in stating that the determination of whether a taking has occurred generally involves *ad hoc* factual inquiries.[12] However, in this case the issue of whether the length of the permit process was reasonable is more a legal than a factual inquiry. The parties agree that from the date of docketing to the date of issuance, the permit process took almost sixteen months, but they disagree as to the legal effect of this time period, that is, whether it was long enough under the circumstances to constitute a temporary taking of plaintiffs' 70 acres of wetlands.[13]

Plaintiffs attempt to prove they have been denied the economically viable use of the 70 acres allegedly taken by showing that, between 1984 and 1988, the land generated only $12,076 in revenues from timber harvesting, billboard rental and farming. Plaintiffs claim the property was worth $7,154,155 in 1984.

■ The key factor in evaluating the reasonableness of the length of the permit application process for a temporary taking claim is whether it amounts to "extraordinary delay." The Supreme Court has suggested that "extraordinary delays" in the process of government decision-making may give rise to a temporary taking claim. *First Lutheran Church, supra,* 482 U.S. at 321, 107 S.Ct. at 2389; *Agins, supra,* 447 U.S. at 263 n. 9, 100 S.Ct. at 2143 n. 9. On the other hand, the Supreme Court has stated that "mere fluctuations in value during the process of government decision-making, absent extraordinary delay, are 'incidents of ownership' ... which cannot be considered as a "taking" in the constitutional sense." *Agins, supra,* 447 U.S. at 263 n. 9, 100 S.Ct. at 2143 n. 9 (citing *Danforth v. United States,* 308 U.S. 271, 285, 60 S.Ct. 231, 236–37, 84 L.Ed. 240 (1929)).

■ The materials before the court do not indicate that sixteen months to process plaintiffs' § 404 permit for 70 acres rises to the level of "extraordinary delay." The permit process in this case is analogous to "the case of normal delay in obtaining building permits, changes in zoning ordinances, variances, and the like" which do not give rise to a taking in the constitutional sense. *First Lutheran Church, supra,* 482 U.S. at 321, 107 S.Ct. at 2389. As noted above, the mitigation negotiations alone consumed at least ten of the sixteen months it took to process plaintiffs' first

---

1989. Plaintiffs do not deny that they were free to fill, develop and sell the land upon receipt of their § 404 permits. The permits were not contingent upon, or subject to, any "final approval" by the Corps.

12. In support of its motion for summary judgment, defendant has filed a 241–page administrative record, which includes a detailed account of the permit application process. In support of their position opposing defendant's motion for summary judgment, plaintiffs have submitted declarations from plaintiff Dufau and from a geography professor, Dr. Emmer. Dufau's declaration describes undisputed factual events and alleged damages. Emmer's declaration does not touch on the delay issue. Neither declaration identifies or raises factual issues with regard to the Corps' alleged delay in the

permit application process. Accordingly, summary judgment, on this record, is appropriate under the circumstances. *See Troise v. United States,* 21 Cl.Ct. 48, 60 (1990) (summary judgment may prevent trial if movant shows trial would be useless since more evidence than is already available would not change result).

13. In *Foster v. City of Detroit,* 254 F.Supp. 655, 661 (E.D.Mich.1966), *aff'd,* 405 F.2d 138 (6th Cir.1968), the court found that ten years constituted unreasonable delay in a condemnation proceeding. In *Sun Oil Company v. United States,* 215 Ct.Cl. 716, 746, 572 F.2d 786 (1978), the Court of Claims found that 68 days to issue a permit involving technical, scientific and environmental complexities is not unreasonable *per se.*

§ 404 permit application. Dufau's thank-you letter to the Corps dated March 10, 1986 indicates that the Corps was a helpful facilitator in the application process. Moreover, to the extent that plaintiffs' claim for unreasonable delay in the permit process includes the time elapsed between the date of the cease and desist order (May 1, 1984), and the date plaintiffs were advised to submit an after-the-fact permit application (September 28, 1984), this argument lacks merit. Plaintiffs admit that they did not seek information from the Corps after the cease and desist order, but rather waited for instructions from the Corps as to how to proceed. The materials before the court do not support a finding that the Corps acted in bad faith at any point in their dealings with plaintiffs. Government officials are presumed to carry out their duties in good faith, and it takes "well-nigh irrefragable proof" to overcome this presumption. *Knotts v. United States,* 128 Ct.Cl. 489, 492, 121 F.Supp. 630 (1954); *Essen Mall Properties v. United States,* 21 Cl.Ct. 430, 443 (1990).

Plaintiffs also complain that the length of the permit process has caused them to suffer great economic loss due to the concurrent decline in the Louisiana real estate market. However, as stated above, the court does not find the length of the permit process to be unreasonable or extraordinary under the circumstances. The government is not liable for the alleged decline in the value of plaintiffs' land during the permit application process. *See First Lutheran Church, supra,* 482 U.S. at 321, 107 S.Ct. at 2389 (quoting *Agins, supra* ). Moreover, the nature of plain-

tiffs' land may be partly to blame for plaintiffs' difficulty in selling it, which brings to mind the Federal Circuit's reminiscence of a time when "wetlands were called swamps." *Florida Rock Industries, supra,* 791 F.2d at 902. Finally, it must be kept in mind that "there are many laws and government operations which have an injurious effect on, or even destroy, the value of property but are not considered takings." *Rogers Truck Line, Inc. v. United States,* 14 Cl.Ct. 108, 112 (1987) (citing *Omnia Commercial Co. v. United States,* 261 U.S. 502, 43 S.Ct. 437, 67 L.Ed. 773 (1923)). "One must look to the character and extent of any interference with property rights whenever a taking claim is asserted." *Sun Oil Company v. United States,* 215 Ct.Cl. 716, 769, 572 F.2d 786, 818 (1978). Even though plaintiffs may have sustained economic losses as a result of the Corps' legitimate exercise of its § 404 jurisdiction, " 'proof of damage alone does not necessarily prove a taking.... Only consummated acts which actually deprive an owner of property [or] ... of valuable existing property rights' " may form the basis for a taking. *Deltona Corp. v. United States,* 228 Ct.Cl. 476, 485–86, 657 F.2d 1184, 1190 (1981) (quoting *Yazel v. United States,* 118 Ct.Cl. 59, 72, 93 F.Supp. 1000, 1003 (1950)), *cert. denied,* 455 U.S. 1017, 102 S.Ct. 1712, 72 L.Ed.2d 135 (1982).[14]

## CONCLUSION

For the foregoing reasons, the court grants defendant's motion for summary judgment. The Clerk of the court is direct-

---

**14.** Even when a permit is denied, in whole or in part, this court's predecessor has been reluctant to find a taking based on economic loss alone. In *Deltona, supra,* the Court of Claims found no taking even though the plaintiff had sustained an economic loss as a result of the Corps' denial of a permit to dredge and fill its land. *Deltona, supra,* 228 Ct.Cl. at 493, 657 F.2d at 1193. In *Jentgen v. United States,* 228 Ct.Cl. 527, 657 F.2d 1210 (1981), *cert. denied,* 455 U.S. 1017, 102 S.Ct. 1711, 72 L.Ed.2d 134 (1982), the Court of Claims found no taking even though the landowner had suffered an economic loss as a result of the Corps' issuance of a permit to fill only 20 of the 80 acres requested in the permit application.

More recently, the Claims Court observed that in considering whether an owner has been deprived of economically viable uses of his land, the evaluation is based "not on a mere diminution of value nor on a denial of the highest and best use of the property, but on the value of the remaining uses to which the property may be put." *Allied–General Nuclear Servs. v. United States,* 12 Cl.Ct. 372, 375 n. 1 (1987), *aff'd in part and rev'd in part on other grounds,* 839 F.2d 1572 (Fed.Cir.), *cert. denied,* 488 U.S. 819, 109 S.Ct. 61, 102 L.Ed.2d 39 (1988). *See also Sun Oil Company, supra.*

ed to dismiss plaintiffs' complaint. No costs.