**MORTON THIOKOL, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 317–83L.

United States Claims Court.

Feb. 22, 1984.

Raymond P. Buschmann, Chicago, Ill., for plaintiff; Donna A. Plumb, Chicago, Ill., of counsel.

Gerald T. Levin, Washington, D.C., with whom were Asst. Atty. Gen. F. Henry Habicht, II, George R. Hyde, and Donald F. Rosendorf, Washington, D.C., for defendant.

## OPINION

NETTESHEIM, Judge.

This inverse condemnation case is before the court after argument on defendant's motion for summary judgment and plaintiff's motion for partial summary judgment on the issue of liability.

## FACTS

The facts either have been stipulated or they have not been contested in accordance with RUSCC 56(e).[1] Morton Thiokol, Inc. ("plaintiff"), of which Morton Salt is an unincorporated division, owns and operates a salt mine at Weeks Island, Iberia Parish, Louisiana. On October 7, 1977, the Federal Energy Administration (the "FEA"), predecessor of the Department of Energy (the "DOE"), contracted to buy a salt mine cavern from plaintiff for use as an oil storage facility in connection with the Strategic Petroleum Reserve Program. It was the parties' intention that the FEA would purchase only certain defined stratified interests in plaintiff's salt dome, consisting of the cavern itself and a 300-foot thickness or "sill" of salt (hereinafter referred to as the "original sill") to serve as a buffer between the cavern and a new salt mine which, it was agreed, plaintiff would begin immediately below the sill. The Mining Enforcement Safety Administration ("MESA") had notified plaintiff that a 300-foot sill appeared to be adequate for safety purposes, subject to the results of "geotechnical and finite analysis studies in progress and to be conducted."

An Operating Agreement incorporated into the Offer To Sell Real Property (the "Contract") provided at paragraph 4:

It is expressly understood ... that MORTON has retained fee simple title to all of its Weeks Island property, except with respect to the specific property interests being conveyed ... and, accordingly, that MORTON has the full right and title with respect to the remainder of its property at Weeks Island, to utilize the same for any and all business purposes, including—but not limited to—the construction of the New Mine, free from any interference from the activities of the UNITED STATES in connection with the oil storage program, except to the extent expressly set forth in this Agreement.

The Contract recited that plaintiff was to convey for $30 million "title only to the properties ... specifically described" and that plaintiff did not relinquish "its fee simple title, ownership or any appurtenances thereto with respect to its present fee simple title ownership of Weeks Island outside, either vertically or horizontally, of the said properties."

Because Louisiana law did not recognize a fee simple in a horizontal stratum, such as the parties wished to convey between them, and would have forced the FEA to acquire either fee simple title of the salt dome to the center of the earth or an easement in a horizontal section, the parties agreed that the United States would institute condemnation proceedings in federal district court to acquire the stratum defined in the Contract. The Contract recited that Louisiana law did not affect the ability of the United States to acquire by condemnation fee simple title to the described interest "without, in the process, acquiring fee simple title or any other property interests to any areas outside those described ... which, by such specific descriptions, limits the scope of the properties intended to be acquired by the UNITED STATES."

The Operating Agreement, *inter alia,* provided for the coordination of the parties' activities and, in paragraph 5, that each party would

(b) [e]xercise due care and undertake all prudent precautions so as not to endanger

1. The proper interpretation of one contractual provision is disputed. *See infra* note 2.

person or property or cause injury, death, loss or property damage at Weeks Island;

(c) Comply with all applicable requirements of MESA, or its successor;

(d) Coordinate their facilities and activities so as to avoid any injury, death, loss or property damage, and so as to minimize any disruption of activities at Weeks Island, except to the extent expressly provided for in this Agreement.

Owing to government time constraints, the Operating Agreement was concluded and condemnation proceedings instituted before the results were published of the geotechnical survey commissioned by the FEA to determine the necessary sill thickness between the storage cavern and the new mine. An FEA memorandum dated June 1, 1977, covering a meeting between officials of the FEA and plaintiff, supports plaintiff's assertion that a pressing timetable existed for the commencement of oil storage. The General Accounting Office in a report issued on August 14, 1978, entitled "Questionable Suitability of Certain Salt Caverns and Mines for the Strategic Petroleum Reserve" [hereinafter cited as the "GAO Report"], also stated that officials of MESA's successor, the Mine Safety and Health Administration ("MSHA"), had found that the FEA's "mine testing program was not adequate."

The FEA-commissioned survey, published in November 1977, after the district court's order for delivery of possession on October 20, 1977, advised against mining below the storage cavern; moreover, another study undertaken by MESA's successor MSHA concluded in July 1978 that at least a 650-foot sill was necessary to protect against the danger to the cavern of "blowouts" unless facts were provided which would assure the adequacy of a lesser thickness. Blowouts, which were not foreseen by the parties in agreeing to the original sill, are holes in the ceilings of salt mines, some hundreds of feet high, which result when blasting in gas-bearing salt formations causes more salt to be broken than planned. Such an occurrence is unpredictable, and if one of these holes were to extend up to the oil storage cavern, an obvious catastrophe would result. Before the Louisiana court ordered delivery of the property conveyed on October 20, 1977, however, plaintiff had commenced construction on the new mine within the additional 350-foot area which, together with the original sill, would have formed the 650-foot recommended sill. (This additional 350-foot area will be referred to hereinafter as the "additional sill.")

In a memorandum to the Secretary of Labor, MSHA Assistant Secretary Robert B. Lagather stated in mid-1978, referring to DOE's operating the oil reserve facilities without adequate buffers, that "[s]hould the present course of action be continued by DOE, we will have no recourse other than to issue withdrawal orders as mandated by ... the Federal Mine Safety and Health Act of 1977...."

Among other efforts to persuade MSHA that the additional sill was not necessary, plaintiff commissioned its own study to assess whether the additional sill was required to guard against blowouts. The study results failed to persuade MSHA that a lesser sill was adequate, although MSHA officials as of early 1979 indicated their willingness to discuss the matter further with plaintiff and to review any other tests or studies plaintiff wished to submit. The parties agree that MSHA's position concerning the minimum 650-foot sill is the same today as it was in 1978–79. By letter of May 18, 1979, plaintiff advised MSHA that, as a result of the MSHA study, plans for an alternate mine had been developed and demanded compensation for the additional sill. Thereafter, plaintiff filed an amended answer in the condemnation action claiming additional compensation for its loss. Upon defendant's motion for summary judgment asserting lack of jurisdiction, the district court declined jurisdiction over plaintiff's claim, which it deemed one for inverse condemnation cognizable in this court, rejecting plaintiff's characterization of the claim as one for severance damages arising from the original condemnation.

## DISCUSSION

1. To support liability in its favor, plaintiff argues that the district court's decision that its claim did not arise from the original taking was based on an affirmative finding that, instead, a new taking had occurred. According to plaintiff, the latter determination should be given collateral estoppel effect in this proceeding because it was essential to the district court's determination that jurisdiction was lacking. Defendant counters that the district court merely was characterizing plaintiff's claim and that it would have been impermissible for the district court, in the process of deciding that it lacked jurisdiction, to adjudicate a claim for an additional taking. According to defendant, the district court thereby would have enlarged the taking beyond the interests specified in the Government's complaint in condemnation for which alone that court had jurisdiction to award compensation.

■ The district court's observations may be apt, but they do not foreclose this court from its independent inquiry as to whether a compensable taking has occurred. The issue decided by the district court was solely jurisdictional and did not slice through to the merits. See *Mother's Restaurant Inc. v. Mama's Pizza, Inc.*, 723 F.2d 1566, 1569–71 (Fed.Cir.1983) (discussing criteria for issue preclusion, or collateral estoppel). See also *United States v. Mendoza*, ⸺ U.S. ⸺, ⸺, 104 S.Ct. 568, 571, 78 L.Ed.2d 379 (1984); *International Order of Job's Daughters v. Lindeburg & Co.*, 727 F.2d 1087, 1090 (Fed.Cir.1984). Although it was necessary to characterize plaintiff's claims in order to make its jurisdictional ruling, the "finding" that defendant had taken plaintiff's property was not essential to the court's determination that plaintiff's

claim was for inverse condemnation and that jurisdiction lay in this court. See *Rivers v. Norfolk, Baltimore & Carolina Line, Inc.*, 210 F.Supp. 283, 284–86 (E.D.Va.1962) (finding that plaintiff was subject to Longshoremen's and Harbor Worker's Act entailed a finding that he was not a seaman excluded from that act). The Supreme Court recently sounded a note of caution in *United States v. Mendoza*, ⸺ U.S. at ⸺, 104 S.Ct. at 571, regarding application of the doctrine of issue preclusion to the Government, because, *inter alia*, "Government litigation frequently involves legal questions of substantial public importance . . . ." The courts have been zealous, as defendant's many authorities demonstrate, to reserve to this court jurisdiction over every aspect of a claim for inverse condemnation. If this court were bound to defer to the district court's "findings" on point, the transfer to this court would be cosmetic. Therefore, collateral estoppel will not foreclose this court's full exercise of its jurisdiction.

2. Plaintiff cites the district court's Order for Delivery of Possession as granting the Government possession only "in accordance with the attached 'Operating Agreement.' " Plaintiff argues that the "entire thrust" of the Operating Agreement is to allow, and even facilitate, plaintiff's mining beneath the cavern; that the Contract and Operating Agreement provisions expressly reserving the uncondemned strata to plaintiff evince this intent; and that the Government made various representations to the same effect. These contractual provisions and representations, plaintiff contends, show an agreement between the parties giving plaintiff the right to mine the additional sill, which defendant has breached.[2] The court does not reach this issue.

---

2. In particular, plaintiff faults defendant with violation of the provisions of the Operating Agreement, which require the parties not to endanger each other's operations, by its failure to acquire the additional sill needed to protect plaintiff's subjacent mining from inundation. Defendant argues that paragraph 5(c), in which the parties agree to "[c]omply with all applicable requirements of MESA" embodies a calculated risk taken by plaintiff that MESA (or its successor MSHA) would later require an addi-

tional sill, thereby thwarting plaintiff's plans for the new mine. Defendant also makes the unsupported assertion that the $30 million was "for all claims," which is contradicted both by the Contract language, quoted *supra* at 2 (evidencing a limited acquisition), and by joint stipulation no. 28 (evidencing payment for the mine and original sill only). Plaintiff retorts that since it was already bound to obey MSHA directives, the quoted provision really was in-

3. The gravamen of plaintiff's complaint is a claim in inverse condemnation for the loss of the additional sill, an issue which our Federal Circuit deems a question of fact. *Yuba Goldfields, Inc. v. United States,* 723 F.2d 884, 889 (Fed.Cir.1983). The parties' joint factual stipulation reveals that the dispute here concerns the inferences to be drawn from agreed-on facts. In contrast, plaintiff in *Yuba* opposed the Government's motion for summary judgment on the ground that a disputed factual issue existed whether the Government had prevented plaintiff from extracting precious metals from land. *Id.* at 887–90. The sole factual issue raised by the Government in this case, unsupported by affidavit or any other evidentiary material, is that plaintiff may have other reasons for not mining the additional 350-foot sill.[3] This position does not dispute that plaintiff was prevented from mining, although it raises a question that may be relevant to damages. Therefore, no genuine issue of material fact is present to bar summary judgment on plaintiff's taking claim.

Plaintiff argues that the Government's "need for a safe barrier to contain the oil so restricts and interferes with Morton's use of its property as to constitute a taking of the 350-foot additional sill . . . ." The district court summarized the matter well:

> [T]he taking is a clear enlargement of the declaration of taking; the government is using the 350-foot portion . . . as fully as it is using the 300-foot portion of the sill which was described in the declaration of taking. . . .

tended to bind the Government to obey MSHA directives *by condemning the additional sill* should that become necessary to protect plaintiff's miners.

Contractual provisions are to be construed in their context, looking at the document as a whole. *See National Railroad Passenger Corp. v. United States,* 3 Cl.Ct. 516, 518–19 (1983) (NETTESHEIM, J.) (citing cases). In light of all the meticulous contractual provisions stressing plaintiff's retention of the lower strata and coordination of the oil storage project with the subjacent mining activity (most of which are directed at protecting the miners) and given that the parties were forced to antici-

. . . [T]he damages claimed here result from total, exclusive use of the remainder by the. government. When the property taken by the government is viewed as a container for oil, it is untenable to argue that the government only uses or exercises dominion over the inner volume of that container . . . .

*United States v. 429.83 Acres of Land,* Civ. No. 771149, slip op. at 6 (W.D.La. Mar. 16, 1983).

Defendant contends in its motion for summary judgment that MSHA's action in preventing plaintiff from mining in the additional sill is an exercise of the police power and, as such, is noncompensable. Plaintiff opposes, arguing that an exercise of police power may be compensable, citing *Pennsylvania Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922) ("[I]f regulation goes too far it will be recognized as a taking. . . .") [hereinafter cited as "*Pennsylvania Coal Co.*"].

"The term 'police power' connotes the time-tested conceptional limit of public encroachment upon private interests." *Goldblatt v. Hempstead,* 369 U.S. 590, 594, 82 S.Ct. 987, 990, 8 L.Ed.2d 130 (1962). The Supreme Court has not defined the police power and has imposed only the requirements that its exercise be required by the public interest and that the means be reasonably necessary to accomplish the purpose and not unduly oppressive to individuals. *Id.* at 594–95, 82 S.Ct. at 990–91. An inherent power of the state, the police power has even been described as synonymous with sovereignty. 16A Am.Jur.2d *Constitutional Law,* §§ 360–61 (1979). Under this view

pate the results of the geotechnical study by government time constraints, defendant's interpretation of paragraph 5(c) is untenable.

3. The issue to be tried, as framed by defendant, was

> [w]hether Morton had reasons independent of, and not addressed by, the MSHA Task Force recommendation for not mining in the additional 350-foot buffer area. Defendant submits that because of other problems connected with mining in the 350-foot buffer area, Morton may have decided voluntarily not to mine there.

the police power is coextensive with the power of the Government. If the police power exception to just compensation is limited only by the sovereign power of the Government, however, it becomes the exception which swallows the rule, an intolerable result. *See Pennsylvania Coal Co.*, 260 U.S. at 415, 43 S.Ct. at 160. The problem is to define what governmental actions and what exercises of police power constitute "takings" within the meaning of the fifth amendment.

"[T]he predominant characteristic of this area of law is a welter of confusing and apparently incompatible results...." As the Supreme Court itself has acknowledged, " 'no rigid rules' or 'set formula' are available to determine where regulation ends and taking begins." Sax, *Takings and the Police Power*, 79 Yale L.J. 36, 37 (1964); *see Yuba Goldfields, Inc. v. United States*, 723 F.2d at 887 (citing, *inter alia*, Sax). The Supreme Court frequently has observed that whether a given exercise of police power constitutes a taking depends upon the particular facts of that case. *Penn Central Transport Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978) [hereinafter cited as *"Penn Central Transport Co."*].

An old line of cases bases the distinction between a compensable taking and the exercise of the police power on whether the governmental action operates to secure a benefit for or to prevent a harm to the public (the "noxious use" theory). *See, e.g., Mugler v. Kansas*, 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205 (1887). The theory is summed up in the adage, *"Sic utere tuo ut alienum non laedas"*—use your own property in such a way as not to harm another's. When the police power ventured into such areas as zoning and conservation, however, this polestar disappeared over the horizon. Conceptual problems with the theory have also become apparent: The prohibited use often is not intrinsically noxious; instead, the problem arises from two innocuous but conflicting activities. For example, buildings near airports can be regarded as a menace to air navigation or the aircraft can be considered a nuisance to owners of property adjoining the airport, and building height restrictions then can be viewed as the taking of an easement over the adjacent property. *See generally* Annot., 18 A.L.R. 4th 542 (1982).

Many regulations of general impact, such as zoning laws, have been held to be noncompensable exercises of the police power on the similar theory that they secure an "average reciprocity of advantage," *Penn Central Transport Co.*, 438 U.S. at 147, 98 S.Ct. at 2671 (Rehnquist, J., dissenting) (quoting *Pennsylvania Coal Co.*, 260 U.S. at 415, 43 S.Ct. at 160), for all those affected. This rationale is less persuasive, however, when only one or a few individuals are affected by a regulation which is for the benefit of a specific public asset. *Id.* The fifth amendment guarantee of just compensation was intended primarily to bar the Government "from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960). Thus, several courts have held, in airport zoning cases, that a regulation for the sole benefit of an airport is a taking because it is for a specific public use, whose burden falls on a few individuals—a very different matter from a regulation of widespread application. *See* Annot., 18 A.L.R. 4th, *supra*, at 549, 553.

Even when the challenged regulation was of widespread or general application, the Supreme Court has held that if it goes too far in depriving an owner of the use of his property, a regulation will be held to constitute a taking. The classic formulation of this rule was in *Pennsylvania Coal Co.*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322, in which a regulation forbidding mining companies to cause subsidence of superadjacent buildings was held to be a taking of claimant's coal because it made the extraction of the coal uneconomical.

■ Diminution in property value standing alone, however, does not constitute a taking. *Penn Central Transport Co.*, 438 U.S. at 131, 98 S.Ct. at 2662. Nor does the

mere fact that the owner is deprived of the most profitable use of his property. *United States v. Central Eureka Mining Co.,* 357 U.S. 155, 168, 78 S.Ct. 1097, 1104, 2 L.Ed.2d 1228 (1958). The Government otherwise would be forced to regulate by purchase. *Andrus v. Allard,* 444 U.S. 51, 65, 100 S.Ct. 318, 326, 62 L.Ed.2d 210 (1979). Instead, "the 'taking' issue in these contexts is resolved by focusing on the uses the regulations permit." *Penn Central Transport Co.,* 438 U.S. at 131, 98 S.Ct. at 2663. A "taking" nonetheless occurs if the regulation "denies an owner economically viable use of his land." *Agins v. Tiburon,* 447 U.S. 255, 260, 100 S.Ct. 2138, 2141, 65 L.Ed.2d 106 (1979); *see Deltona Corp. v. United States,* 228 Ct.Cl. 476, 657 F.2d 1184 (1981).

In this case plaintiff clearly has no economically viable use of its salt besides mining it.[4] Defendant urges, however, that the court should look at plaintiff's salt dome as a whole in determining the degree of loss and not just at the 350-foot parcel at issue, citing *Agins v. Tiburon,* 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106; *Penn Central Transport Co.,* 438 U.S. at 130–31, 98 S.Ct. at 2662–63, and *Deltona Corp.,* 228 Ct.Cl. at 489–90, 657 F.2d at 1192. The question of the extent of plaintiff's economic loss does not arise here however; instead, the deciding factor in this case is the character of the government action involved.

In *Penn Central Transport Co.,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631, the Supreme Court identified the economic impact of the regulation on the claimant and the extent to which the regulation interferes with investment-backed expectations as factors that have particular significance in determining whether a taking has occurred. A third factor given was "the character of the governmental action." 438 U.S. at 124, 98 S.Ct. at 2659. For example, a physical invasion by the government is more likely to constitute a taking than interference arising from "some public program adjusting the benefits and burdens of economic life to promote the common good." *Id.* The court also listed "government actions that may be characterized as acquisitions of resources to permit or facilitate uniquely public functions" as a type of government action constituting takings. *Id.* at 128, 98 S.Ct. at 2661 (citing, *inter alia,* Sax, *Takings and the Police Power, supra,* 74 Yale L.J. 36).[5]

■ In the instant case, the restriction against plaintiff's mining operations plainly is for the benefit of a specific public work. The Government is using the additional sill in exactly the same way it is using the original sill which it condemned and paid for. If plaintiff is not entitled to compensation for its inability to mine the additional sill, then the compensation paid to plaintiff when the original sill was condemned was a gratuity.[6] This case therefore is distinguishable from *Deltona Corp.,* involving the denial of development permits pursuant to a national program of protecting wetlands; *Agins,* in which zoning laws forbade

---

4. Defendant did not oppose plaintiff's summary judgment motion on the ground that a genuine issue existed as to an alternative use. *See supra* note 3.

5. Having drawn a distinction between the Government's role as an "arbitrator" between conflicting activities in the private sector and its role as an "enterpriser" operating schools, building roads, maintaining an army, and acquiring assets and resources, Sax proposed:

   [W]hen economic loss is incurred as a result of government enhancement of its resource position in its enterprise capacity, then compensation is constitutionally required .... But losses, however severe, incurred as a consequence of government acting merely in its arbitral capacity are to be viewed as a

noncompensable exercise of the police power.

*Id.* at 63. Sax based his proposal on the argument that the fifth amendment guarantee was intended not to protect property values or alleviate economic distress caused by governmental action, but as a safeguard against arbitrary, despotic, and self-aggrandizing government. The proposed rule also has the advantage that it gives content to the phrase "for public use" in the language of the fifth amendment.

6. Although it is true that the original sill was sold as a container for the cavity to store oil and that the parties did not foresee the blowout phenomenon, the parties stipulated that the original sill was also intended to satisfy MSHA's requirements.

claimant to build more than five residences on a five-acre plot; and *Penn Central Transport Co.,* wherein the Supreme Court expressly rejected the contention that the prohibition against altering a landmark owned by claimants was an appropriation of their property for a governmental purpose, stressing that the law applied to "vast numbers of structures in the city," 438 U.S. at 134, 98 S.Ct. at 2664, although it concededly burdened some landowners more than others.

4. Defendant argues that plaintiff has failed to exhaust administrative remedies by challenging MSHA's determination under the revised procedures set out in 30 U.S.C. § 815(d) (1976) (Supp. I 1977), which call for an administrative hearing upon issuance of a challenged order by MSHA.

█ The short answer is that MSHA's determination is not at issue here. Plaintiff is not seeking premature judicial review of the MSHA agency action, but is claiming just compensation for the loss of its property resulting from MSHA's decision with which it has no quarrel. Although defendant posits that MSHA might be willing to approve a lesser sill, "taking" jurisprudence does not require a party seeking compensation to challenge the underlying governmental action solely to reduce the amount of a resultant "taking" if the Government's actions otherwise amount to a taking.

█ Adopting the position that the additional sill might not be necessary after all, defendant argues that "[u]ntil it has probed the state of the art information available, and presented this information to MSHA, Morton cannot claim it has truly been prevented from mining the 350 feet of salt strata at issue....'." Defendant continues

that MSHA has not actually forbidden plaintiff to mine the additional sill, but merely made known its position that such mining would be unsafe. Plaintiff has already commissioned one study in an effort to show that the extra sill is unnecessary. MSHA informed plaintiff that, if anything, this study supported MSHA's conclusions. Over four years later, MSHA still has not changed its position. Although MSHA announced its willingness to revise its opinion should plaintiff come forward with new evidence, there is nothing in the record to suggest that the possibility of some day proving the adequacy of a lesser sill is anything more than speculative. The right to just compensation does not depend on the Government's action assuming such formal garb as a final administrative order, but only upon Government action having the effect of an exercise of the eminent domain power. *See Yuba Goldfields, Inc. v. United States,* 723 F.2d at 887; *Benenson v. United States,* 212 Ct.Cl. 375, 548 F.2d 939 (1977) ("taking" found where Government, by delaying planned condemnation of landmark, prevented owners from making profitable use of it). Here, MSHA has announced and continues to represent that it would issue a withdrawal order if DOE and plaintiff continued with the new mine. MSHA effectively has prevented the new mining operation by conditioning reconsideration of its position on evidence that plaintiff's uncontroverted affiant[7] states has not been developed by plaintiff or anyone else.[8]

Plaintiff is prevented from excavating the new mine not only by MSHA's *de facto* prohibition, but also by the danger of causing an inundation of oil onto the heads of its own miners, as revealed by the MSHA study. Thus, the Government's storage fa-

---

7. Defendant's reply brief reprinted what it represents to be an exerpt from a government laboratory study conducted at Weeks Island in 1979 indicating that a 300-foot sill was adequate given the blowout phenomenon historically observed there. The parties did not stipulate to the admissibility of any such document; plaintiff challenges its authenticity; consideration of the reference is proscribed by RUSCC 56(c); and under ¶ V.H. of this court's "Order Governing Proceedings Before Trial," entered

on May 23, 1983, the proponent of summary judgment is required to submit documentary evidence to support its motion.

8. Plaintiff also argues cogently that the Government has the responsibility of challenging an administrative decision which requires the DOE to purchase the additional sill to fulfill its obligations under paragraph 5(c) of the Operating Agreement. *See supra* note 2.

cility has effectively deprived plaintiff of the use of the stratum at issue just as the aircraft overflights in *United States v. Causby,* 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206 (1946), deprived plaintiff in that case of his dwelling and chicken farm. Under the circumstances both MSHA's failure to issue a formal order and the question whether such an order would be a compensable or noncompensable exercise of the police power are irrelevant:

> [A]lthough there may be no official intention to acquire any property interest, certain governmental actions entail such an actual invasion of private property rights that a constitutional taking must be implied.

*Eyherabide v. United States,* 170 Ct.Cl. 598, 601, 345 F.2d 565, 567 (1965) (citing cases).

## CONCLUSION

Based on the foregoing, plaintiff's motion for partial summary judgment is granted based on Count I of its complaint and is otherwise denied. Defendant's motion for summary judgment is denied.

IT IS SO ORDERED.