**JARBOE–LACKEY FEEDLOTS, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 233–84C.

United States Claims Court.

Jan. 11, 1985.

David O. Stewart, Washington, D.C., for plaintiff; Charles D. McAtee and Anne L. Baker, Eidson, Lewis, Porter & Haynes, Topeka, Kan., of counsel.

Ronald A. Schechter, Washington, D.C., with whom was Acting Asst. Atty. Gen., Richard K. Willard, Washington, D.C., for defendant; Sally Stratmoen, Regulatory Division, U.S. Dept. of Agriculture, Washington, D.C., of counsel.

## OPINION

NETTESHEIM, Judge.

This case is before the court after argument on plaintiff's motion for partial summary judgment and defendant's motion for summary judgment.

## FACTS

The action represents the last avenue of relief available to plaintiff Jarboe-Lackey Feedlots, Inc. ("plaintiff"), for gaining judicial vindication after the seizure of 273 of its steers which were subsequently processed and reduced to 2,156 boxes of boned beef weighing approximately 154,000 pounds and 17,732 pounds of offal. During

the over-two-year period involved in the seizure, subsequent condemnation action, and release of the 2,156 boxes, the beef by-products were stored under refrigeration, and their value at sale decreased from a pre-seizure sale price of $224,412. Plaintiff seeks to recover $94,307 in diminished value.[1]

The following facts that are material to the resolution of the parties' arguments are undisputed.

DES, or diethylstilbestrol, is a synthetic estrogen used as a cattle feed supplement. DES has been known to cause cancer in animals. The federal court of appeals, to which appeal was taken on certain issues relating to this matter, upheld as having a reasonable basis in fact the finding by the district court that DES was a known carcinogen in humans, as well. *See United States v. 2,116 Boxes of Boned Beef,* 726 F.2d 1481, 1488 (10th Cir.), *cert. denied,* —— U.S. ——, 105 S.Ct. 105, 83 L.Ed.2d 49 (1984).

Over time the Food and Drug Administration (the "FDA"), pursuant to the Food Drug and Cosmetic Act, 21 U.S.C. §§ 301–392 (1982), has both allowed and disallowed use of DES. The regulatory history of the drug is discussed by the district court that tried the condemnation action of plaintiff's beef. *See United States v. 2,116 Boxes of Boned Beef,* 516 F.Supp. 321, 325–26 (D.Kan.1981), *aff'd,* 726 F.2d 1481 (10th Cir.),[2] *cert. denied,* —— U.S. ——, 105 S.Ct. 105, 83 L.Ed.2d 49 (1984). *See also Hess & Clark, Division of Rhone-Rodia, Inc. v. FDA,* 495 F.2d 975 (D.C.Cir.1974). After

25 years during which DES was approved as an additive in cattle feed and ear implant in cattle, the Commissioner of the FDA, upon learning that use of DES resulted in potentially carcinogenic residues in edible tissues of treated animals and because the levels of concentration below which DES was harmless had not been ascertained, ordered that the use of DES in cattle be halted by July 20, 1979. 44 Fed.Reg. 39,-618–19 (1979). This action, which amounted to a revocation of approval of a new drug application, was upheld. *Rhone-Poulenc, Inc., Hess & Clark Division v. FDA,* 636 F.2d 750 (D.C.Cir.1980). The July 20, 1979 date was twice postponed at the request of plaintiff and others, finally to November 1, 1979. 44 Fed.Reg. 45,764 (1979).

After the effective date of the latest ban of DES, the USDA adopted regulations to permit the marketing of "hundreds of thousands of cattle," Def's Brief filed Oct. 31, 1984, at 9, that had been implanted with DES after the effective date of the ban. 45 Fed.Reg. 26,947 (1980). Plaintiff's cattle were not excepted from the ban under this so-called "explant program." The FDA also tolerated the sale of beef that had been implanted with DES prior to November 1, 1979. 45 Fed.Reg. 27,014.

Plaintiff was aware that DES implants were illegal after October 31, 1979, because it had requested a stay of the effective date of the ban. Although inadvertently, plaintiff used DES implants in the subject cattle after October 31, 1979. The cattle were duly slaughtered bearing DES implants in their ears.

---

**1.** Plaintiff originally also sought to recover storage charges that were awarded by the district court in the condemnation action that is discussed in this opinion. Having been paid those charges after commencing suit here, plaintiff has abandoned that part of its claim. Plaintiff claims interest on the processing and storage costs awarded by the district court, but did not move for summary judgment on that ground. Defendant moved for summary judgment complete, arguing that plaintiff's interest claim was barred by 28 U.S.C. § 1500 (1982), which deprives this court of jurisdiction of the same claim pending in the district court.

After the parties' cross-motions were briefed, the district court on December 19, 1984, denied

the interest claim finding there was no statutory basis for it. The denial was without prejudice so that plaintiff could pursue a claim for interest in this court.

**2.** Among the issues on appeal were plaintiff's attack on the district court's jurisdiction over the seizure and condemnation action and the finding that plaintiff's cattle were illegally implanted with DES. The Tenth Circuit also affirmed the denial of attorneys' fees and dismissal of a motion and counterclaim in recoupment, matters not addressed by the district court's opinion.

The second regulatory player in this case is the Food and Safety Inspection Service (the "FSIS") of the United States Department of Agriculture (the "USDA"), which administers the Federal Meat Inspection Act, 21 U.S.C. §§ 601–680 (1982) (the "FMIA"). On April 17, 1980, an FSIS meat inspector ordered plaintiff's 273 carcasses to be segregated after he observed what he suspected were DES pellets in the ears of slaughtered cattle and obtained seven ears containing implant samples, one of which was lost. Test results on the six were positive, confirming the pellets to be DES.

The United States filed a seizure and condemnation action on May 14, 1980, under the FMIA, 21 U.S.C. § 673(a)(2),[3] against plaintiff's beef and offal in the United States District Court for the District of Kansas, which provided for the issuance of a warrant for arrest. A United States Marshal then seized the beef and offal, and plaintiff intervened as a claimant. The complaint alleged that the meat was adulterated within the meaning of the FMIA, 21 U.S.C. § 601(m)(1) (substance present in sufficient quantity to render it injurious to health), (m)(2)(A) (substance makes article unfit for human consumption), and (m)(3) (meat unfit for human food).[4] Prior to trial the USDA analyzed certain samples of liver and kidney from plaintiff's beef. No detectable level of DES was reflected in any one of the liver samples utilized, but eight of 15 kidney samples reflected some DES.

The condemnation action was tried over 18 days during October-November 1980. In its 29-printed-page decision issued on May 7, 1981, the court held that plaintiff was responsible for illegally implanting its cattle with DES during the ban, that plaintiff was aware of the ban, that DES was a carcinogen and was harmful and deleterious within the meaning of the FMIA, and that the Government had not proved that there was sufficient DES to make it harmful in plaintiff's beef. The court found that the test results of the kidney samples were unreliable, holding with respect to section 601(m)(1) "that the evidence overwhelmingly suggests that this beef is not adulterated," *2,116 Boxes of Boned Beef,* 516 F.Supp. at 342; that the Secretary's past actions in allowing the sale of beef with DES implanted before October 31, 1979, and prohibiting the marketing of plaintiff's beef without giving notice that the presence of DES residue would make it subject to seizure "show that the Secretary's proceeding [under section 601(m)(2)(A)] would be arbitrary, irrational and capricious, and punitive," 516 F.Supp. at 345; and that, with respect to section 601(m)(3), "no evidence was even offered

3. The Government agrees, based on ¶ VIII of the complaint in rem filed on May 1, 1980, that the action was maintained under section 673(a)(2). This statute reads in pertinent part:

Any carcass, part of a carcass, meat or meat food product of cattle, sheep, swine, goats, horses, mules or other equines, or any dead, dying, disabled, or diseased cattle, sheep, swine, goat, or equine, that is being transported in commerce or otherwise subject to subchapter I or II of this chapter, or is held for sale in the United States after such transportation, and that ... (2) is capable of use as human food and is adulterated or misbranded, ... shall be liable to be proceeded against and seized and condemned ... in any United States district court ....

4. Section 601(m) provides in pertinent part:

The term "adulterated" shall apply to any carcass, part thereof, meat or meat food product under one or more of the following circumstances:

(1) if it bears or contains any poisonous or deleterious substance which may render it injurious to health; but in case the substance is not an added substance, such article shall not be considered adulterated under this clause if the quantity of such substance in or on such article does not ordinarily render it injurious to health;

(2)(A) if it bears or contains (by reason of administration of any substance to the live animal or otherwise) any added poisonous or added deleterious substance (other than one which is (i) a pesticide chemical in or on a raw agricultural commodity; (ii) a food additive; or (iii) a color additive) which may, in the judgment of the Secretary, make such article unfit for human food;

\*　\*　\*　\*　\*　\*

(3) if it consists in whole or in part of any filthy, putrid, or decomposed substance or is for any other reason unsound, unhealthful, unwholesome, or otherwise unfit for human food; ....

consistent with these conditions." 516 F.Supp. at 350. The court's view of the evidence is typified by the following passage:

> Simply stated, it is the Court's view that when an administrative opinion is geared to wholly unfounded bases of fact, none of which can be reasonably established, it makes no sense at all. Such conduct is arbitrary and irrational and is most deserving of the Court's review. This is such a case.

*Id.* at 349. The court directed the Government to return the beef and pay "costs of this action, including the cost of storage of beef ...." *Id.* at 351.

The opinion continues:

> Claimant's [plaintiff's] claim for attorney fees and costs of litigation [is] taken under advisement. In this, the Court is mindful of the provision in the Equal Access to Justice Act but in doubt as to its applicability here. Claimant counsel is at liberty to prepare his motion and briefs as relate to this matter at his earliest convenience.
>
> The Court is further mindful that the commercial value of the beef in question has probably diminished by reason of time and delay. In this, it is assumed that an appropriate claim will be processed, either under the provisions of the Federal Tort Claims Act or perhaps within the framework of this litigation. In every event, this Court retains jurisdiction as to its disposition.

*Id.* It is undisputed that the district court did not issue a certificate under 28 U.S.C. § 2465 (1982), which shields the Government from liability for the costs of such seizure if the court finds that reasonable cause for the seizure existed and issues a certificate to that effect.

Upon cross-appeals of the order dismissing the condemnation action, the court of appeals by order of November 3, 1981, dismissed the appeals on the ground that the district court had not indicated what its position would be in the matter of attorneys' fees that plaintiff had claimed under the Equal Access to Justice Act, 28 U.S.C. § 2412 (1982) (the "EAJA").

On June 9, 1981, plaintiff had filed a counterclaim complaint in the district court action. The second count, pertinent to the suit in this court, averred determination of the condemnation proceeding in plaintiff's favor and lack of probable cause for the seizure and sought the return of plaintiff's property in the same condition as when it was seized, together with compensation for reduction in value during its detention under federal warrant and costs and attorneys' fees. The claim for diminution in value was grounded on 28 U.S.C. § 2465, in addition to 21 U.S.C. §§ 673–74.[5] Attorneys' fees were requested pursuant to the EAJA, 28 U.S.C. § 2412.

In response to the Tenth Circuit's direction, the trial court on February 8, 1982, made oral findings of fact, first with respect to the counterclaim complaint. Characterizing the counterclaim's second count as a claim for recoupment, the court directed plaintiff to seek possession of the beef because the beef's value could not be set until it was ready for distribution or return to plaintiff:

> I am mindful that we are dealing with a perishable product that probably diminishes in value daily, and until we have a final date set when I know with certainty that at that point in time we can reasonably ascertain its value as of that time, anything else is speculation.

Transcript in *United States v. 2,116 Boxes of Boned Beef,* No. 80–1360, Feb. 8, 1982, at 111 (D.Kan.) [hereinafter cited as "Tr."]. The court said that it intended to preserve the rights of claimant and dismissed the counterclaim complaint and a pending motion for recoupment

> as being either untimely or not relevant nor pertinent to the issues here.

---

5. This statute merely confers jurisdiction in federal district courts to consider violations of section 673.

As to the recoupment, it's also dismissed consistent with the order that has been entered as to the rights of the claimant to refile it at some later date. Tr. at 112.

The court made findings under section 2412(d) of the EAJA, applying, as does the United States Court of Appeals for the Federal Circuit, the standard of reasonableness for testing whether the conduct of the Government was substantially justified.[6] Tr. at 113–14. The court specifically found with respect to the reasonableness of the seizure ("the propriety of the filing of this case"):

I would find that as of April of '80 Jarboe-Lackey cattle had been illegally implanted with DES after its legal deadline.... [P]robably Mr. Lackey was not aware of this circumstance, but illegal nonetheless. I would find that the DES implants were prominent and palpable in the cattle's ears at the time of slaughter. I would find that at that point in time, which is significant here as I would look at what transpired in April, there was ongoing a DES ban by the FDA and the Agriculture Department. There was in the hands of the enforcement arm of that department or those departments responsible published scientific treatises that would suggest that the tissue residue persisted in implanted cattle and, most important, I would find that DES was a known carcinogen in humans and in animals.

It would seem to me with those facts at hand it would be reasonable for the Government's representative to conclude that unless the beef were seized the meat or the byproducts in this action would be

introduced into commerce, the thrust of which ... most reasonably suggests that *the Government had every right, if not the duty, to proceed with the seizure action.*

Tr. at 115–16 (emphasis added).

The court further found that the case was a "classic" case, Tr. at 117, "that had to be tried and only until it was tried could the Government or the livestock industry or this claimant understand the facts ...." On this basis the court denied attorneys' fees under the EAJA.[7]

The Government had moved for certification of probable cause, which pursuant to 28 U.S.C. § 2465 would have exonerated defendant from any costs relating to the seizure. The court overruled the Government's motion, saying, "I don't believe it's necessary here to address it. I think my findings are addressed to the same issues substantially...." Tr. at 118. Upon the foregoing findings, the court entered its order on February 8, 1982, stating, in pertinent part:

Since the dismissal of this matter by the Tenth Circuit Court of Appeals, the claimant has refiled its counter-cross-complaint and a motion for recoupment. The merits of these matters have also been briefed and argued this date.

Consistent with the findings of fact and conclusions of law announced this date, claimant's counter-cross-complaint and motion for recoupment, being untimely and irrelevant, are hereby dismissed.

An amended judgment dismissing the complaint and the counter-cross-complaint, and denying the motions for recoupment and

---

6. The court found no bad faith under 28 U.S.C. § 2412(b) in the preparation or filing of the action. Tr. at 114–15. These findings were upheld on appeal. *2,116 Boxes of Boned Beef,* 726 F.2d at 1488.

7. Costs allowable under 28 U.S.C. § 1920 were awarded under 28 U.S.C. § 2412(a) to plaintiff as the prevailing party. Unlike subsections 2412(c) or (d), an award under subsection (a) is not predicated on any characterization of the losing party's conduct.

In ruling on plaintiff's EAJA application, the district court denied "fees and costs of litigation." Tr. at 118. However, "costs of this action" had been awarded to plaintiff already. *2,116 Boxes of Boned Beef,* 516 F.Supp. at 351. The district court's language in the EAJA hearing did not negate the prior award of litigation costs, judgment for which entered on December 19, 1984. That language, in context, refers to attorneys' fees and expenses.

attorneys' fees and costs entered on February 16, 1982.

On appeal the Tenth Circuit affirmed the district court's findings on the EAJA ruling concerning the reasonableness of the seizure, addressing squarely plaintiff's claim of inconsistency between the trial court's "objurgatory remarks about the Government's evidence," *2,116 Boxes of Boned Beef*, 726 F.2d at 1487, and its refusal to find the Government's position unreasonable: "The fact that the government lost the case does not give rise to a presumption that its position was not substantially justified; nor does the loss coupled with the court's critical comments establish entitlement to fees...." *Id.* at 1488. Regarding denial of plaintiff's motion for recoupment and counterclaim for recoupment under 21 U.S.C. § 673 and 28 U.S.C. § 2465, whereby plaintiff sought compensation for the diminished value of the beef during the period of detention, the court held that because the Government was seeking seizure and condemnation remedies, recoupment was not a proper remedy in that recoupment is the means by which a defendant reduces a plaintiff's money judgment. 726 F.2d at 1490. The court pointed out that section 673 of the FMIA does not provide for suit to be brought against the Government. According to the Tenth Circuit, although 28 U.S.C. § 2465 provides for recovery of costs, immunity is reserved when " 'it appears that there was reasonable cause for the seizure.' Although the district court did not enter a certificate as provided in the statute, there is little doubt there were reasonable grounds for the seizure of Jarboe-Lackey carcasses." 726 F.2d at 1491 (citation omitted).

The court of appeals concluded by advising that plaintiff "may not be entirely without recourse. It may still have a cause of action against the government under the Tucker Act," *id.* (citation omitted), because the Tucker Act, 28 U.S.C. § 1491(a)(1) (1982), provides a basis for compensating statutory takings that are not fully compensated by the statute authorizing the taking. *Ruckelshaus v. Monsanto Co.*, —— U.S. ——, 104 S.Ct. 2862, 2880–81, 81

L.Ed.2d 815 (1984). On that invitation suit was commenced in this court to recover the diminished value of the beef under 28 U.S.C. § 2465 and the fifth amendment to the U.S. Constitution, which prohibits the taking of property without just compensation. Plaintiff also contends that the Government breached an implied contract to return the property in the same value as at the time of seizure.

## DISCUSSION

*Liability for wrongful seizure under 28 U.S.C. § 2465*

28 U.S.C. § 2465 provides in full:

Upon the entry of judgment for the claimant in any proceeding to condemn or forfeit property seized under any Act of Congress, such property shall be returned forthwith to the claimant or his agent; but if it appears that there was reasonable cause for the seizure, the court shall cause a proper certificate thereof to be entered and the claimant shall not, in such case, be entitled to costs, nor shall the person who made the seizure, nor the prosecutor, be liable to suit or judgment on account of such suit or prosecution.

Plaintiff contends that because the district court refused to issue a certificate of reasonable cause under 28 U.S.C. § 2465, the Government is liable for the reduction in value of its beef during the condemnation proceeding. The stonewall response to recovery under this theory is that the district court's findings, as affirmed by the Tenth Circuit, directly estop plaintiff from seeking to relitigate the findings pursuant to the EAJA concerning the reasonableness of the Government's action. The principle of claim preclusion also bars the recoupment claim insofar as it was determined, after briefing on the merits, that 28 U.S.C. § 2465 does not provide a statutory basis for plaintiff's counterclaim.

Judge Nies of the Federal Circuit has written recently and in depth on the "doctrine of res judicata" and its principal

components of direct and collateral estoppel, which operate to preclude relitigation of issues between the same parties and between the same party and a different party, respectively, and "claim preclusion," which forecloses assertion of the same transactional facts as a different cause of action or theory. *See Jackson Jordan, Inc. v. Plasser American Corp.*, 747 F.2d 1567, 1575–76 (Fed.Cir.1984); *Chromalloy American Corp. v. Kenneth Gordon (New Orleans) Ltd.*, 736 F.2d 694, 696–97 (Fed.Cir.1984); *Young Engineers, Inc. v. USITC*, 721 F.2d 1305, 1314–15 (Fed.Cir.1983).

■ The substantial justification of the Government's actions in seizing plaintiff's beef and attempting to condemn it has been "actually and necessarily determined by a court of competent jurisdiction" and therefore the district court's findings with respect thereto are "conclusive in a subsequent suit involving the parties to the prior litigation" under the doctrine of collateral (or direct) estoppel. *International Order of Jobs Daughters v. Lindeburg & Co.*, 727 F.2d 1087, 1090 (Fed.Cir.1984). *Mother's Restaurant, Inc. v. Mama's Pizza, Inc.*, 723 F.2d 1566, 1569 (Fed.Cir.1983), utilized a four-part test to determine whether a party is collaterally (or directly) estopped. There must be identical issues, actually litigated in an action in which the party to be estopped is fully represented and which generate findings necessary to a judgment. *Id.*

■ Here, the issue is identical because in order to shield the Government from liability, the court was required to determine whether the Government had made a showing of reasonable or probable cause for the seizure. The issue was actually litigated in that "the parties to the original action disputed the issue and the trier of fact resolved it." *Continental Can Co. v. Marshall*, 603 F.2d 590, 596 (7th Cir.1979) (quoted in *Mother's Restaurant*, 723 F.2d at 1570). The trial court's findings that the Government acted reasonably must have been necessary to the judgment in order to have conclusive effect in this court. *Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979) (cited in *Mother's Restaurant*, 723 F.2d at 1571). Under the EAJA a finding of reasonableness is pivotal to an award under section 2412(d)(1)(a). Finally, plaintiff itself appeared in the prior EAJA proceeding and was represented most capably by associate counsel in this action.

Plaintiff's counterclaim for recoupment is barred under the doctrine of res judicata, because the appeals court concluded that 28 U.S.C. § 2465 does not waive the sovereign's immunity to a claim for diminished value of a seized *res*. 726 F.2d at 1491. The Tenth Circuit based its conclusion on the record below stating, "[T]here is little doubt that there were reasonable grounds for the seizure ...," *id.*, even though the district court did not issue a certificate. *Accord United States v. 1,500 Cases, More or Less, Etc.*, 249 F.2d 382, 384 (7th Cir.1957) (finding reasonable ground for seizure and denying claim under section 2465 despite Government's lack of request for certificate at trial level). Plaintiff cannot relitigate its claim under section 2465, whether or not styled as one for recoupment.

■ Apart from issue and claim preclusion, plaintiff's claim is not cognizable under section 2465, which provides that the claimant shall not be entitled to "costs" if "it appears that there was reasonable cause for the seizure" and the court has so certified. The Sixth Circuit in *United States v. One 1965 Chevrolet Impala Convertible*, 475 F.2d 882, 886–87 n. 3 (1973), rejected the argument that section 2465 prohibits a court from requiring the Government to reimburse a claimant for depreciated value of a seized and forfeited *res* when the forfeiture is later declared void, because section 2465 addresses itself only to court costs and costs incident to seizure. The court cited to *United States v. One 1949 GMC Truck*, 104 F.Supp. 34, 37 (E.D.Va.1950), which analyzes the liturgy of costs, concluding that costs of seizure exclude costs of storage and include "towing, hauling, loading and unloading,

and such other expenses as may be incurred in effecting the seizure." *Accord United States v. One 1969 Plymouth Two-Door Hardtop*, 360 F.Supp. 488, 489 (M.D. Ala.1973). In the absence of any authority supporting a contrary view, it is held that "costs" under section 2465 do not include a claim for diminished value of the *res* from seizure to destruction or sale of the *res*.[8]

Defendant argues that preclusive effect should be given to the Tenth Circuit's ruling that section 2465 does not waive the sovereign's immunity to suit for diminished value of a seized *res*. This court's holding that such damages are not costs for purposes of section 2465 is a variation on the proposition that sovereign immunity has been waived under section 2465 for costs relating solely to the seizure.

*Unconstitutional taking of property without just compensation*

The Government would paint the seizure as a quintessential exercise of police power, for which the Government need not provide compensation, while plaintiff takes the position that the appropriation of its beef during the period of detention constitutes an unlawful temporary taking for which plaintiff must be compensated. Although the Federal Circuit, through Chief Judge Markey, has cautioned that "[t]he fact-intensive nature of just compensation jurisprudence ... argues against precipitous grants of summary judgment...," *Yuba Goldfields, Inc. v. United States*, 723 F.2d 884, 887 (Fed.Cir.1983); *see Skaw v. United States*, 740 F.2d 932 (Fed.Cir.1984), the material facts are not in dispute, and the issue can be resolved as a matter of law.

Plaintiff relies on three cases to perfect its fifth amendment claim. In both *United States v. One 1965 Chevrolet Impala Convertible*, 475 F.2d 882, and *United States v. One 1961 Red Chevrolet Impala Sedan*, 457 F.2d 1353 (5th Cir.1972), the Sixth and Fifth Circuits, respectively, held that seizures and forfeitures in contravention of the owners' fifth amendment rights gave rise to claims under the Tucker Act, now codified at 28 U.S.C. § 1491(a)(1). The key to these cases is the Supreme Court's holding in *United States v. United States Coin & Currency*, 401 U.S. 715, 91 S.Ct. 1041, 28 L.Ed.2d 434 (1971), that the privilege against self-incrimination was a complete defense to a forefeiture proceeding resulting from a criminal prosecution against a gambler for failure to register and pay the gambling tax. Thus, the seizures of the vehicles were themselves constitutionally tainted. No such defect permeates the seizure in this case since it was authorized by a statute which is constitutionally unassailable. It is true that the well-respected decision in *Jaekel v. United States*, 304 F.Supp. 993 (S.D.N.Y.1969), would recognize a claim under 28 U.S.C. § 1491(a)(1) for the value of property taken in a forfeiture proceeding without due process of law when plaintiff had no notice of the forfeiture. In the instant case, the district court

---

8. The district court's award of "costs of this action, including the cost of storage of beef," *2,116 Boxes of Boned Beef*, 516 F.Supp. at 351, and the Government's payment of these items are not inconsistent with the conclusion that defendant has been absolved by the district court and Tenth Circuit from having to pay costs under section 2465. Plaintiff reads the district court's award of litigation costs to plaintiff as inconsistent with the Tenth Circuit's ruling that the lower court's action was tantamount to issuing a certificate of reasonable cause and shielding the Government from costs. An award of litigation costs, however, is available under 28 U.S.C. § 2412(a), which presumably is where the district court grounded its award of "costs of this action." *See supra* note 7.

The other costs paid by the Government do not include those relating to the seizure. In addition to storage charges, the Government has paid charges that plaintiff characterizes as "expenses incurred in de-boning and processing the product for storage." Plf's Motion for Order To Show Cause filed in D.Kan. (date uncertain) at 5 (submitted with Def's Suppl. Filing filed Jan. 4, 1985). The freight costs appear to have been generated in transporting the beef to cold storage. However, even if some of the charges that have been paid were generated by the seizure and were incorrectly paid by the Government after the Tenth Circuit read the district court as having relieved defendant from payment of section 2465 costs, the court has ruled that plaintiff's claim for diminished value under section 2465 is barred by res judicata and that diminished value is not recoverable under section 2465.

found that the failure of notice under one of the three statutory provisions upon which defendant sought to condemn plaintiff's meat, 21 U.S.C. § 601(m)(2)(A), amounted to a deprivation of due process, and the seizure was deemed unlawful on that basis. *2,116 Boxes of Boned Beef,* 516 F.Supp. at 345–46. The seizure, however, also was predicated on the two other subsections of 21 U.S.C. § 601(m)—(1), (3)— and as to these no ruling was made that the seizure had any constitutional infirmity.

Plaintiff argues that the Secretary's action in seizing and condemning the beef ultimately was found to be arbitrary and capricious and, hence, unlawful. Defendant rejoins that the district court's finding that the seizure was reasonable is decisive. The district court's findings under the EAJA do not restrict this court's examination of the legality of the seizure under the fifth amendment insofar as the question is one of law. The point of law is whether the failure of the condemnation infects the underlying seizure. The court agrees with defendant that the two are separate actions. *See United States v. 1500 Cases More or Less, Etc.,* 249 F.2d at 384; *United States v. Tito Campanella Societa di Navigazione,* 217 F.2d 751, 756 (4th Cir. 1954).

In *North American Cold Storage Co. v. Chicago,* 211 U.S. 306, 29 S.Ct. 101, 53 L.Ed. 195 (1908), the Supreme Court upheld a state seizure action involving contaminated meat, even though notice and hearing had been postponed, on the ground that such seizure is valid to protect the public from contaminated food. The Court allowed that an action for value of meat could be based on an unjustified seizure and destruction—one in violation of the statute. 211 U.S. at 316, 29 S.Ct. at 104. A compensable taking, however, need not be permanent; indeed, plaintiff argues that its claim is for a temporary taking, citing *Kimball Laundry Co. v. United States,* 338 U.S. 1, 16, 69 S.Ct. 1434, 1443, 93 L.Ed. 1765 (1949) (property condemned for use as a military laundry; recovery for

diminution in value due to loss of trade routes allowed); *United States v. Pewee Coal Co.,* 341 U.S. 114, 71 S.Ct. 670, 95 L.Ed. 809 (1951) (Government liable for operating losses during period mine taken over to avert nationwide coal strike); *R.J. Widen Co. v. United States,* 174 Ct.Cl. 1020, 1032, 357 F.2d 988, 996 (1966) (per curiam) (temporary taking from date United States went upon land until land condemned by state); *Causby v. United States,* 109 Ct.Cl. 768, 772, 75 F.Supp. 262, 264 (1948) (temporary taking by flight easement resulting in destruction of personal property); *Todd v. United States,* 155 Ct.Cl. 87, 94–96, 292 F.2d 841, 845–46 (1961) (fishing rights curtailed); *Seery v. United States,* 142 Ct.Cl. 234, 161 F.Supp. 395 (1958) (house in Vienna occupied as resting center for enlisted men). As the Court of Claims stated in *Causby,* no difference exists between the destruction of personal and real property. In either case the owner is deprived of its use as the natural consequence of the deliberate, intended act of an asserted power.

The Supreme Court in discussing the " 'ad hoc, factual' inquiry" that must be undertaken to identify whether a compensable taking has occurred, has identified three factors: "the character of the governmental action, its economic impact, and its interference with reasonable investment-backed expectations." *Ruckelshaus v. Monsanto Co.,* 104 S.Ct. at 2874–75 (citing, *inter alia, Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978)). This court in *Morton-Thiokol, Inc. v. United States,* 4 Cl.Ct. 625 (1984) (order granting motion for summary judgment on liability), had occasion to distinguish between action constituting a noncompensable exercise of police power and a taking based on whether the governmental action operates to secure a benefit for or to prevent harm to the public. *See id.* at 629–31. Enforcement of " 'regulations which were enacted in good faith, and had appropriate and direct connection with that protection to life, health, and property which each

State owes to her citizens'" traditionally has constituted a noncompensable exercise of the Government's police power. *Mugler v. Kansas,* 123 (7 Otto) U.S. 623, 666, 8 S.Ct. 273, 299, 31 L.Ed. 205 (1887) (citations omitted) (quoting *Patterson v. Kentucky,* 97 U.S. 501, 506, 24 L.Ed. 1115 (1878)). The prohibition of a use in the exercise of the police power, which leads to depreciated value, is distinguished from the taking of property for public use. *Andrus v. Allard,* 444 U.S. 51, 65–66, 100 S.Ct. 318, 62 L.Ed.2d 210 (1979); *see Mugler v. Kansas,* 123 (7 Otto) U.S. at 668–69. In *Miller v. Schoene,* 276 U.S. 272, 279–80, 48 S.Ct. 246, 247, 72 L.Ed. 568 (1928), the Supreme Court sustained an exercise of the police power requiring the destruction of red cedar trees because they were infected with red cedar rust and thereby imperiled more valuable adjacent apple orchards. Even if the Government, instead of destroying or ordering the destruction of property, takes the property because it is or may be injurious to the predominant public interests of health, safety, and property protection, the action is not converted to a compensable taking. *See Calero-Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 680, 94 S.Ct. 2080, 2090, 40 L.Ed.2d 452 (1974) (upholding Puerto Rican statute providing for forfeiture by innocent owner of boat involved in transporting contraband).

 Regulation amounting to seizure of meat unlawfully implanted with a prohibited drug is an inherent exercise of the police power. The seizure power with respect to meat that may be adulterated is intended to prevent a harm—a health hazard—to the public. Thus, the seizure and detention of plaintiff's beef until released by the court presiding over the condemnation action is not actionable as a taking. *See Loftin v. United States,* 6 Cl.Ct. 596 at 612 (1984), *appeal docketed,* No. 85–1017 (Fed.Cir. Jan. 9, 1985).[9]

*Recovery under an implied-in-fact contract*

Plaintiff contends that a contract implied in fact arose from the seizure whereby defendant agreed to return plaintiff's beef at its sale value.[10] Defendant interposes the defense that the prerequisites to such a contract, especially authority to contract, are lacking. *See South Louisiana Grain Service, Inc. v. United States,* 1 Cl.Ct. 281, 288–89 (1982). The proponent of an implied-in-fact contract must prove offer and acceptance, intent to contract, and actual authority reposing in the officer whose conduct is relied upon to bind the Government to contract. *Orchards v. United States,* 749 F.2d 1571 at 1575 (Fed.Cir.1984).

In *Kessler v. United States,* 229 Ct.Cl. 472 (1981), the United States Court of Claims read the petition to state an implied-in-fact contract to return a certificate of deposit at the close of criminal proceedings. The court denied the Government's motion to dismiss and remanded to the former trial division to examine the question of whether the alleged breach or taking occurred. On remand defendant once again moved for summary judgment, consistent with its position in this court that no contract implied in fact could be found because no Government official had authority binding the

9. The Government has similarly broad powers with respect to detentions effected under Congress' authority to regulate foreign commerce. In *Meserey v. United States,* 447 F.Supp. 548 (D.Nev.1977), the court found no taking when goods were detained by the FDA to determine compliance with the Food and Drug Act. *See Buttfield v. Stranahan,* 192 U.S. 470, 493, 24 S.Ct. 349, 354, 48 L.Ed. 525 (1904) (law setting quality standards for importation of beef upheld against taking claim as within congressional power to regulate foreign commerce).

10. The parties do dispute whether the governmental action constituted interference with reasonable investment-backed expectations. Defendant takes the position that because plaintiff warranted in selling the beef that the beef was not implanted with DES, plaintiff's expectations were shattered or at least rendered unreasonable when the beef was found to contain DES. Plaintiff takes a contrary view. Because the court deems the seizure to be a valid exercise of the Government's police power, it is not necessary to reach this issue of disputed material fact.

United States to promise to return the certificate when it was seized. The Claims Court denied the motion and set the matter for trial. *Kessler v. United States*, 3 Cl.Ct. 123 (1983). *Kessler* is good authority for the proposition that a contract may be implied in fact to return seized property. However, central to the Court of Claims' holding was that the taking could not occur until the Government ceased to hold the property as a mere custodian. 229 Ct.Cl. at 126.

Plaintiff's other cases involve the failure of the United States Customs Service to locate goods for return after inspection. In *Hatzlachh Supply Co. v. United States*, 444 U.S. 460, 466, 100 S.Ct. 647, 651, 62 L.Ed.2d 614 (1980) (per curiam), the Supreme Court held that Tucker Act jurisdiction existed for breach of an implied contract for bailment based on the failure of the Customs Service to locate detained goods for return to their owner. No opinion was expressed as to whether the facts in that case gave rise to such a cause of action. *Id.* at 466 n. 6, 100 S.Ct. at 651 n. 6. The court in *Alliance Assurance Co. v. United States*, 252 F.2d 529 (2d Cir.1958), found a promise by the Customs Service to return goods after inspection based on the claim ticket issued by the Service to their owner. The bailment implied in fact provided jurisdiction under the Tucker Act.

Defendant urges that *Alliance Assurance* has been distinguished in *Walker v. United States*, 438 F.Supp. 251, 258 (S.D. Ga.1977), a seizure and forfeiture case, on the ground that "[a]n inspection and a seizure are two different things, creating two different relationships." However, the forfeiture statute in *Walker* vested title in the Government at the time of the prohibited act. Subject to judicial determination, the right to title was the Government's, title had transferred, and no bailment could be created. *Id.* The statute in this case does not work a forfeiture until the beef is condemned. Although *Walker*'s distinction between a seizure and inspection fails under the facts of this case, neither *Hatzlachh* nor *Alliance Assurance* presents a contract implied in fact to return goods at the value they held at seizure, based on a seizure of meat reasonably suspected of bearing illegal drug implants.

■ As plaintiff's affiant explains, the storage of the frozen beef for 28 months caused its decline in value. "Beef is ordinarily sold fresh, and any beef which has been frozen for more than two years ... will suffer a substantial loss in value." Affidavit of Lanny L. Binger, Oct. 16, 1984, ¶ 4. The trial court also was of the view "that we are dealing with a perishable product that probably diminishes in value daily .... Tr. at 111.[11] The facts cannot support an inference that the Government agreed by its conduct in seizing the beef to compensate plaintiff for diminished value during the period of detention. This case does not present either *Hatzlachh*'s or *Alliance Assurance*'s loss of goods detained for inspection. In those cases the claimants had the reasonable expectation that their detained goods would be returned. In this case plaintiff's contract expectations are frustrated by its own actions, because it is not reasonable to anticipate that beef bearing illegal implants will not be detained long enough to try and decide a condemnation action. Moreover, plaintiff has made no showing that anyone associated with the seizure had actual authority to bind the Government to pay for diminution in the market value of the beef during the long period of its detention in cold storage, and defendant has submitted an affidavit disavowing authority.

## CONCLUSION

Based on the foregoing, plaintiff's motion for partial summary judgment is denied, and defendant's motion for summary

---

11. The court has found that a genuine issue of material fact exists as to whether the false warranty of no DES implants affected the sale price in the first instance. *See supra* note 10.

judgment is granted except as to the issue of interest. *See supra* note 1.

IT IS SO ORDERED.